# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

CHARLES GRIGSON, LISA HOING, and §
DAVID KELLY, Individually and on behalf §
of all putative class members, §
§
    Plaintiffs, §
§   Civil Action No. 1:17-cv-00088-LY
v. §
§
FARMERS GROUP, INC., §
a Nevada corporation, §
§
    Defendant. §

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    PROCEDURAL HISTORY ................................................................................. 1

III.   FACTUAL BACKGROUND ............................................................................... 2

    A.     FA2 and FSPA ......................................................................................... 2

    B.     FGI, By Internal Company Policy, Precludes Existing Customers From FSPA In Furtherance of "Open-Closed" Book Strategy. ...................................... 3

       1.     FGI's Development of FSPA ....................................................... 4

       2.     FGI Implements FSPA in Texas at 20% Lower Rates Than FA2. ............. 5

       3.     FGI Almost Entirely Precludes FA2 Customers From FSPA. ................. 6

          a.     FGI Internally Caps Rewrites at 2%. ............................... 8

          b.     FGI Closely Monitors Rewrite Activity and Threatens Agents. ........................................................................ 10

          c.     FGI Modifies Agent Compensation Structure to Further Discourage and Punish Rewrite Activity. ................... 11

          d.     FGI Fabricates Negative Impacts of Switching to FSPA. ............ 12

          e.     FGI Imposes Procedural Hurdles to Switching to FSPA. ............ 13

       4.     FGI's Policy Has Been Very Successful, Resulting in the Categorical Differential Treatment Between Existing and New Customers. .......................................................................... 13

    C.     FGI Repeatedly Misleads The TDI About FSPA. ............................... 14

    D.     FGI's Discriminatory Conduct Defies FGI's Own Risk Analyses. ..................... 15

    E.     FGI's Documents and Witnesses Undercut Its Contentions Regarding Supposed Coverage Differences Between FA2 and FSPA. ......................... 17

    F.     Plaintiffs Are Among the Numerous FA2 Customers Subjected to FGI's Discrimination. ..................................................................................... 21

IV.   LAW AND ARGUMENT ................................................................................. 23

    A.     Class Certification Is Appropriate Under Fed. R. Civ. P. 23(a) and (b)(3) .......... 23

    B.     The Rule 23(a) Elements Are Satisfied ............................................... 23

       1.     Numerosity (Rule 23(a)(1)) ...................................................... 23

       2.     Commonality (Rule 23(a)(2)) .................................................. 24

       3.     Typicality (Rule 23(a)(3)) ........................................................ 26

       4.     Adequacy (Rule 23(a)(4)) ........................................................ 26

**TABLE OF CONTENTS**
**(continued)**

C. Rule 23(b)(3) Is Satisfied .................................................................................27

 1. Common Questions of Law and Fact Will Predominate At Trial ............27

  a. FGI's Liability Is Subject to Common Proof ...............................28

  b. Damages Are Amenable to Classwide Calculation Using a Common Mechanism That FGI Itself Developed. .......................31

  c. Whether FGI's Conduct Was "Knowing" Is Subject to Common Proof ............................................................................36

 2. A Class Action is Superior to Other Methods of Adjudication................37

D. Class Notice Should Be Disseminated By a Court-Approved Administrator.........................................................................................................38

V. CONCLUSION .........................................................................................................38

# TABLE OF AUTHORITIES

Page

## CASES

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ................................................................... 23

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....................................................................... 24, 27, 28

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) .............................................................. 28, 32

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
242 F.3d 290 (5th Cir. 2001) ....................................................................... 32

*Boos v. AT & T, Inc.*,
252 F.R.D. 319 (W.D. Tex. 2008), *modified* (Sept. 17, 2008) ................ 37

*City of Pontiac Gen. Employees' Ret. Sys. v. Dell Inc.*,
No. A-15-CV-374-LY, 2018 WL 1558571 (W.D. Tex. Mar. 29, 2018) ............ 23, 27

*Comcast Corp. v. Behrend*,
569 U.S. 26 (2013) ................................................................................ 31, 32

*Feder v. Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ....................................................................... 26

*Ibe v. Jones*,
836 F.3d 516 (5th Cir. 2016) .............................................................. 24, 31

*In re BP P.L.C. Sec. Litig.*,
No. 10-MD-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ................ 32

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ....................................................... 25, 31, 33

*In re Monumental Life Ins. Co.*,
365 F.3d 408 (5th Cir. 2004) ....................................................................... 23

*James v. City of Dallas*,
254 F.3d 551 (5th Cir. 2001) .............................................................. 23, 26

*Kohen v. Pacific Inv. Management Co. LLC*,
571 F.3d 672 (7th Cir. 2009) ....................................................................... 25

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .............................................................. 31, 32

*Maldonado v. Ochsner Clinic Found.*,
493 F.3d 521 (5th Cir. 2007) ....................................................................... 23

*Mims v. Stewart Title Guar. Co.*,
590 F.3d 298 (5th Cir. 2009) ....................................................................... 25

*Robbins v. Durham Sch. Servs., L.P.*,
No. A-09-CA-609 LY, 2010 WL 11601207
(W.D. Tex. July 12, 2010), *report and recommendation adopted*
2010 WL 11601234 (W.D. Tex. Sept. 7, 2010) ....................................................32

*Serna v. Transp. Workers Union of Am.*,
No. 3:13-cv-2469-N, 2014 WL 7721824 (N.D. Tex. Dec. 3, 2014) ............................23, 24, 26

*Slade v. Progressive Sec. Ins. Co.*,
856 F.3d 408 (5th Cir. 2017) ...............................................26

*Stirman v. Exxon Corp.*,
280 F.3d 554 (5th Cir. 2002) ...............................................26

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S.Ct. 1036 (2016) ...............................................32

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ...............................................24

*Yates v. Collier*,
868 F.3d 354 (5th Cir. 2017) ...............................................24

## STATUTES

Tex. Ins. Code § 544.051 ...............................................28
Tex. Ins. Code § 544.052 ...............................................1, 24, 26, 32
Tex. Ins. Code § 544.054 ...............................................1, 24, 28, 36

## RULES

Fed. R. Civ. P. 23(a) ...............................................passim
Fed. R. Civ. P. 23(b) ...............................................passim
Fed. R. Civ. P. 23(c) ...............................................38

COME NOW, Plaintiffs Charles Grigson, Lisa Hoing, and David Kelly ("Plaintiffs"), who file this Opposed Motion for Class Certification pursuant to Fed. R. Civ. P. 23(a), (b)(3), and (g).

## I.   INTRODUCTION

This case challenges a pervasive, internal, discriminatory scheme implemented by Farmers Group, Inc. ("FGI") against its existing auto insurance customers vis-à-vis new customers, categorically depriving the former from accessing lower rates that would be available to them but for FGI's conduct.  The single cause of action here, and the core common legal and factual issues implicated—including whether FGI engaged in discrimination and whether that misconduct was "knowing"—are ideally suited to class-wide adjudication.  All requirements of Fed. R. Civ. P. 23(a) and (b)(3) are satisfied.  The trial in this case will focus entirely on FGI's conduct directed at the class, not on the circumstances of individual class members.  A class trial will present no significant manageability issues, and in fact represents the only practical way to efficiently adjudicate the claim here on behalf of the hundreds of thousands of FGI policyholders who were subjected to FGI's discrimination.  The Court should grant Plaintiffs' Motion.

## II.   PROCEDURAL HISTORY

Plaintiffs commenced this action on February 8, 2017, and filed the First Amended Complaint ("FAC")[1] on October 22, 2018.  Plaintiffs allege that FGI has discriminated against Plaintiffs and other existing customers by implementing an internal, multi-part policy of preclusion that was intended to, and did, result in existing customers categorically paying higher premiums than otherwise identically-situated new customers for the same or materially the same coverages. Plaintiffs allege that FGI committed this discriminatory conduct knowingly, in violation of Tex. Ins. Code §§ 544.052-054.

---

[1] ECF No. 101.

FGI moved to dismiss and to stay the case on April 3, 2017.[2] In a well-reasoned Report & Recommendation ("R&R"), Magistrate Judge Austin recommended that FGI's motions be denied.[3] Over FGI's Objections, this Court denied FGI's motions and adopted Magistrate Judge Austin's R&R.[4] The case has since proceeded in discovery—including the production of numerous documents, written discovery, and depositions of numerous FGI fact witnesses—which discovery efforts are ongoing.

## III. FACTUAL BACKGROUND

### A. FA2 and FSPA

Since January 4, 2016, FGI has had two personal auto insurance policies (or "books") in Texas: Farmers Auto 2.0 ("FA2") and Farmers Smart Plan Auto ("FSPA"). Prior to that time, all or virtually all Farmers Texas auto customers had FA2.[5] From the time FSPA was launched in Texas in January 2016, FSPA premiums have been generally lower than FA2 premiums, including approximately 20% lower initially.[6] As discussed below, pursuant to an internal FGI scheme, FGI has almost entirely precluded FA2 customers from FSPA and its generally lower premiums which otherwise would have been available to them. *See infra* section III.B.3. By design, the result of FGI's scheme is the continuing existence of two separate books—virtually all existing customers as of January 2016 are "walled off" in FA2 paying generally higher rates, while otherwise identically-situated new customers enjoy FPSA's lower premiums that would be available to both groups but for FGI's discriminatory internal conduct.

---

[2] ECF No. 17, 18.
[3] ECF No. 48.
[4] ECF No. 54.
[5] Ex. 5 (Tai Dep. 118:6-10). References to "Ex." in this brief will refer to exhibits to the Decl. of John R. Davis ("Davis Decl."), submitted herewith at Appendix to the Motion for Class Certification ("App."), Tab A.
[6] Ex. 44 (FGI00153752 at 71); Ex. 5 (Tai Dep. 184:12-18, 211:16-23, 215:25-216:7); Ex. 9 (Tran Dep. 137:5-142:3, 147:14-148:19); Ex. 30 (FGI00105080 [Tran Dep. Ex. 149]); Ex. 31 (FGI00116692 [Tran Dep. Ex. 150]).

### B. FGI, By Internal Company Policy, Precludes Existing Customers From FSPA In Furtherance of "Open-Closed" Book Strategy.

The motivation for the conduct at issue began as a concept in 2013. Worried it was losing market share, FGI began exploring a novel scheme to attract new customers by offering them low rates in a new auto insurance "book," which low rates in turn would be subsidized unwittingly by existing customers "walled off" in the existing book. Existing customers would pay higher rates for the same or materially the same coverages and be artificially precluded, purely by internal company policy, from receiving the lower rates in the new book. FGI ultimately adopted this setup—called an "open/closed" book—in several states including Texas.

It was pursuant to this scheme that FGI introduced FSPA (the "open" book) in Texas in January 2016. In order for the open/closed strategy to work as intended, FGI planned – from the very beginning – to aggressively preclude existing customers in the "closed" book (FA2) from the lower rates in the "open" book (FSPA). When FSPA launched in Texas, FGI adopted a state-wide internal rule that no more than 2% of FA2 customers could be "rewritten" to FSPA, even though all or virtually all FA2 customers were otherwise eligible for FSPA.[7] FGI aggressively monitored and enforced this rule, threatened agents who violated the rule, and implemented other measures towards the same goal (*i.e.*, keeping FA2 customers "walled off" in FA2 and away from FSPA). FGI's internal "cap" and measures undertaken to enforce that rule directly contradicted its representations to the Texas Department of Insurance ("TDI") that existing customers would have the "option" and "flexibility" to switch to FSPA and that Farmers Texas agents would be proactively telling FA2 customers about FSPA and the "option" to switch.

---

[7] Ex. 7 (Mak Dep. 45:17-46:5).

1.    **FGI's Development of FSPA**

Before FSPA's launch, FGI had never maintained two books of personal auto business in any state.[8]  Whenever FGI had launched a new auto product, the existing customers were always "book rolled" into the new product.  In fact, this was the case when FA2 itself was launched.[9] That changed with FGI's development and launch of FSPA.

In early 2013, FGI senior management began exploring an "open/closed" strategy,[10] which would ultimately be adopted by FGI and be the motivation for the conduct at issue here. FGI began working with an industry consultant named Fred Cripe who provided several memos that served as the basis for the development of FSPA (originally called "FA3").[11] Through its partnership with Mr. Cripe, FGI outlined a clandestine strategy to facilitate the offering of lower rates to new business (the "open book") by walling off[12] existing customers in the "closed book" where they would pay the closed book's higher rates and be precluded from accessing the lower rates in the open book.  This is despite the fact that all or nearly all existing customers were otherwise eligible for the open book and its lower rates.[13]  FGI summarized the objective in a July 2013 "FA3 Leadership Meeting" presentation, which stated that the Number 1 "FA3 Guiding Principle" was: "[E]xisting and renewal business will subsidize new business prices."[14]

FGI conducted "Greening Curve" analyses as FSPA was first being developed that measured the loss ratios and relativities[15] of new policyholders versus existing policyholders. These studies were commissioned for the malign purpose of determining the amount of subsidy

---

[8] Ex. 6 (Swope Dep. 186:24-87:4).
[9] Ex. 5 (Tai Dep. 118:6-10 ("[v]ery close to 100 percent" of Texas auto customers rolled into FA2)).
[10] Ex. 10 (Procopio Dep. 23:11-24:18).
[11] *Id.* at 25:1-12; *see also* Ex. 36 (FGI00136681).
[12] Ex. 52 (FGI00216274 at 84).
[13] Ex. 7 (Mak Dep. 45:17-46:5); Ex. 20 (FGI00024634 at 53).
[14] Ex. 58 (FGI00230168 at 70).
[15] A "loss ratio" is "losses divided by premium" and a relativity measures a particular cohort against the whole book.  Ex. 10 (Procopio Dep. 43:8-24).

to be borne by existing policyholders in the closed book. One of the earliest such studies, titled "Open Closed Book – Greening Curves," dated October 2013, states that the "REASON" for the open/closed book strategy was to be "[m]ore competitive in the market by using the profitability from the closed book to subsidize NB [new business] in the open book . . . ."[16] Adamantly denied at first by FGI's witnesses[17] and also by FGI in its Answer,[18] FGI's Don Procopio eventually admitted that these Greening Curve studies were in fact used to tailor the cross-book subsidy.[19]

In late 2013, FGI developed an internal pricing model, the "Open/Closed Book Model," used to price FSPA. One of the model's inputs included an amount of "Rate Change in Closed Books for subsidizing NB" and contained the following descriptor: "This is the amount of rate you would want to take[20] in your closed books so that you are able to reduce your rates in your open books to subsidize new business."[21] FGI's consideration of this approach occurred at the highest levels of the company.[22] FGI's CEO, Jeff Dailey, approved with the understanding that the subsidization should be hidden,[23] calling the open/closed strategy "one of the most important things" accomplished in recent memory by FGI.[24] In another exchange after a meeting about FSPA, Dailey acknowledged the lack of any actuarial basis for this approach.[25]

2.    **FGI Implements FSPA in Texas at 20% Lower Rates Than FA2.**

FGI adopted the open/closed book strategy, which it deployed in conjunction with the rollout of FSPA in several states, including in Texas on January 4, 2016. As it would happen, the

---

[16] Ex. 37 (FGI00137480 at 81).
[17] Ex. 7 (Mak Dep. 160:6-18 ("there was never any subsidization going on.")); Ex. 6 (Swope Dep. 231:10-18 ("I don't believe they are.")).
[18] *E.g.* ECF No. 104 at ¶¶ 37, 45, 71, 87.
[19] Ex. 10 (Procopio Dep. 50:14-57:10, 143:10-13).
[20] "Take" in this context means increase. Ex. 10 (Procopio Dep. 93:18-23).
[21] Ex. 39 (FGI00142325 at 29).
[22] Ex. 10 (Procopio Dep. 129:22-130:13 ("Jeff [Dailey] is aware …")); Ex. 29 (FGI00098106).
[23] Ex. 28 (FGI00091477).
[24] Ex. 27 (FGI00089691).
[25] Ex. 63 (FGI00232130).

price differential between FA2 and FSPA that FGI adopted for Texas ended up being even greater than what FGI's developmental Open/Closed Book Model had set forth. In mid-2015, months before FGI launched FSPA in Texas, senior FGI management insisted on lowering the initial (*i.e.*, launch) FSPA rates to be used (which were already proposed to be significantly lower than FA2 rates) by a further 10%.[26] To accommodate this directive, FGI further increased rates in the closed FA2 book by an additional 1-2% (to achieve what Mr. Procopio described as "revenue neutrality" for the combined books).[27] This change was made over the objection of FGI's Texas Territory Head, Jim Swope,[28] and was implemented in December 2015. The result was that FSPA rates were on average approximately 20% lower than FA2 rates, for the same or materially the same coverages, when FSPA launched in Texas on January 4, 2016.[29]

This 20% average differential between FA2 and FSPA premiums is reflected in FGI's internal analyses. Specifically, FGI developed a tool known as an Auto Off-Balance tool ("AOB"), which measured premium impacts from moving customers from FA2 to FSPA. A sample analysis of 100,000 actual Texas FA2 policies conducted in December 2015 (just before FSPA's Texas launch), showed an average 19.8% savings for FA2 customers re-rated as FSPA policies with the same coverage and coverage limits selections.[30] Since FSPA's launch in Texas, FSPA rates have continued to be generally lower than FA2 rates.[31]

### 3. FGI Almost Entirely Precludes FA2 Customers From FSPA.

Critical to FGI's open/closed book strategy is its discriminatory internal policy of keeping existing customers "walled off" in FA2, even though FSPA would be available to them

---

[26] Ex. 10 (Procopio Dep. 88:25-89:3, 105:7-112:10); Ex. 38 (FGI00138196, at 97 [Procopio Dep. Ex. 177]).
[27] Ex. 10 (Procopio Dep. 103:17-104:13).
[28] Ex. 6 (Swope Dep. 190:15-191:17); *see also id.* at 16:19-17:4.
[29] Ex. 44 (FGI00153752 at 71); Ex. 5 (Tai Dep. 184:12-18).
[30] Ex. 5 (Tai Dep. 184:3-18 (discussing the Dec. 2015 AOB results)).
[31] Ex. 44 (FGI00153752 at 71); Ex. 56 (FGI00222843 at 60); Ex. 22 (FGI00031363).

but for FGI's internal conduct.  From the start, FGI recognized open/closed setup would not work if more than a small percentage of existing customers were allowed to switch to FSPA— the reason being the strategy fundamentally depends on the higher premiums paid by the existing customers in the closed book, which premiums would shrink if existing customers switched to the new book and its lower rates—a phenomenon FGI internally called "artificial premium drain."[32]

In 2013, FGI's consultant warned that "the open/closed company strategy will no longer be viable [with] [b]ook migration exceeding 10% annually[.]"[33] An internal FGI document from March 2014 similarly argued that a "[d]eath [s]piral results if more than 10% of our book moves from FA2[] to [FSPA]."[34] FGI's Don Procopio agreed that keeping all or most of the existing customers in the closed company was a "requirement" for the open/closed scheme.[35]

FGI's laser focus on keeping FA2 customers "walled off" in FA2 only intensified as FGI moved closer to launching FSPA.  When FSPA was formally presented to FGI's Board of Directors for approval, the very first "Primary Project Risk[]" identified was: "Migration of renewal book to open book[.]"[36] FGI personnel presented a "Mitigation Plan" to the Board, stating a "[g]oal [] to have no more than 5% of existing renewals rewrite to FSPA[.]"[37]

After the Board of Directors approved implementing FSPA, FGI adopted and aggressively enforced even tighter internal limitations on FA2>FSPA switches.  In an FSPA "Agency Guide" provided to Farmers Texas agents, FGI stated the policy in simple terms:

> Existing households will remain in FA[2] rather than converting to the new rating plan. . . . In order for our auto growth strategy to work, we will maintain two auto rating plans going forward: one for

---

[32] Ex. 9 (Tran Dep. 117:1-119:6, 210:18-211:4); Ex. 7 (Mak Dep. 67:3-68:11, 129:6-131:22).
[33] Ex. 36 (FGI00136681 at 89).
[34] Ex. 49 (FGI00215535).
[35] Ex. 10 (Procopio Dep. 181:8-19); *id.*at 175:4-176:15.
[36] Ex. 50 (FGI00215676 at 80, 83); *see also* Ex. 10 (Procopio Dep. 193:8-194:7).
[37] Ex. 50 (FGI00215676 at 80, 83).

new business [FSPA] and one for existing business [FA2]. Without two books, we would have to convert FA[2] to FSPA, causing significant premium disruption due to segmentation changes[.][38]

Against this backdrop of preventing FSPA "rewrites" being the most critical execution variable of FSPA and the open/closed strategy, FGI employed numerous measures designed to keep FA2 customers from FSPA. As summarized by one FGI document: "[v]arious strategies [were] deployed to control migration of renewal [FA2] book to New/Open company."[39]

### a.   FGI Internally Caps Rewrites at 2%.

At the heart of FGI's efforts to preclude FA2 customers from accessing FSPA was an internal cap FGI put on the number of FA2 customers agents were permitted to switch (or "rewrite") to FSPA. Just before FGI launched FSPA in Texas, FGI conducted a series of "Road Shows" to introduce FSPA to the agents. At these presentations, FGI's Head of Texas Territory, Jim Swope, warned the agents they were not to rewrite more than 5% of FA2 customers to FSPA.[40] After FSPA was deployed, FGI closely monitored rewrite activity, at the aggregate and individual agent levels, to ensure this internal cap would not be exceeded. Shortly after FSPA's rollout, FGI extrapolated the Texas rewrite rate at about 5%, which FGI viewed as unacceptably high.[41] FGI's CEO Jeff Dailey inquired about stopping rewrites altogether.[42] Mr. Swope's "right-hand man" and Head of Sales in Texas, Dave Thue, agreed that it was necessary to send Farmers Texas agents a "re-communication on no rewrite expectation."[43] Thereafter, in coordination with FGI's Product Management team, Jim Swope sent a January 14, 2016 email to Texas agents that contained explicit instruction and a stark warning about rewrites:

---

[38] Ex. 20 (FGI00024634 at 36); *see also* Ex. 10 (Procopio Dep. 146:19-147:17).
[39] Ex. 59 (FGI00230309 at 12 (emphasis added)).
[40] Ex. 41 (FGI00142569 at 71).
[41] Ex. 9 (Tran Dep. 185:17-186:3).
[42] Ex. 6 (Swope Dep. 56:20-57:5); *see also* Ex. 64 (FGI00237927).
[43] Ex. 7 (Mak Dep. 184:18-25); Ex. 40 (FGI00142452).

My latest report reflects that Texas is rewriting over 5% of their current customers Auto customers to Smart Plan Auto from FA2. At the road show where we introduced both Smart Home and Smart Auto I stressed to you that we could not rewrite our current customers at this rate. . . . only in very select circumstances you [may] use your ability to rewrite an auto. If we continue at this pace we could see additional actions.[44]

In response to this email, one of the seven Texas Area Sales Managers ("ASMs")[45] recommended "be[ing] as severe as possible" with such "offender" agents who switched customers to FSPA "beyond the allowable scope" of 5%.[46] Another ASM in Texas discussed conveying a "serious" message to agents that "immediate change [is] required along with documenting possible consequences"[47] for agents rewriting in excess of the cap.

At his deposition, Mr. Swope (Texas Territory Head) admitted that he provided further direction that Farmers Texas agents should not rewrite more than **2%** of FA2 policies to FSPA,[48] including at a District Manager ("DM") conference in February or March 2016 in Lake Charles.[49] This directive resulted in a cascade of emails from DMs to the agents reiterating a "2% rule" as set out by FGI. For example, DM Scott Hodges warned: "This rule of 1-2% is not a Scott rule[,]it is what the company laid out when we rolled out Smart plan Auto. . . . Therefore, we really cannot have any further rewrites from your agency."[50] One ASM warned the agents in his territory: "As Jim mentioned in Lake Charles we are just over 5% all up for the state. The plan was/is 2%."[51] Mr. Swope testified that the 2% directive came from on high.[52]

---

[44] Ex. 41 (FGI00142569 at 71).
[45] ASMs are FGI employees who oversee the Farmers Texas agents in a particular territory.
[46] Ex. 41 (FGI00142569); Ex. 7 (Mak Dep. 193:11-20 ("… they are offenders, yes.")); Ex. 6 (Swope Dep. 259:15-19).
[47] Ex. 35 (FGI00130879).
[48] Ex. 6 (Swope Dep. 86:12-87:3).
[49] Ex. 9 (Tran Dep. 197:12-16, 198:20-199:3). District Managers are one level below ASMs.
[50] Ex. 43 (FGI00148173 at 73-75).
[51] Ex. 26 (FGI00066080).
[52] Ex. 6 (Swope Dep. 167:23-168:25).

## b.    FGI Closely Monitors Rewrite Activity and Threatens Agents.

From the outset, FGI planned to aggressively monitor rewrite activity to intimidate agents and thus further its goal of keeping FA2 customers walled-off in FA2.[53] The early FSPA conceptual documents from consultant Cripe included specific recommendations in this regard.[54] In the initial agent training materials regarding FSPA, FGI made clear to agents that it would be closely monitoring FSPA rewrites and that agents should expect negative consequences if they exceeded the caps.[55]  As FGI's Don Procopio explained:

> [M]anaging rewrites was an important part of the deployment of Smart Plan Auto, and in order to manage, you need to track. So we needed reports that were going to track the migration.[56]

Just as FGI had warned in the training documents, FGI in fact threatened agents, including with potential termination of their agency contracts, who might exceed the internal rewrite cap. The agents, not surprisingly, took note of FGI's threats.  United Farmers Agent Association's ("UFAA") Legal Director, Kim Rich, wrote in the Summer 2016 edition of The Voice (a publication for Farmers agents), that "[a]gents throughout the U.S. are being threatened not to rewrite more than five percent of their book or face termination."[57]

In fact, FGI discouraged agents from even disclosing *the existence* of FSPA to FA2 customers.  For example, agents were reprimanded for disclosing FSPA to their customers during so-called Farmers Friendly Reviews ("FFRs"), where agents and customers ostensibly were supposed to discuss the customer's Farmers insurance options.[58]

---

[53] Ex. 59 (FGI00230309 at 12 (discussing developing "[n]ew reports . . . to monitor migration")).
[54] Ex. 36 (FGI00136681 at 90).
[55] Ex. 21 (FGI00024671 at 74 ("[**Q.**] Will rewrites be monitored? **ANSWER**: Farmers leadership will be monitoring rewrite activity closely because rewrite activity can increase our rate need as described in the agent training.").
[56] Ex. 10 (Procopio Dep. 190:9-19).
[57] Ex. 68 (PLTF00000110 at 35).
[58] *See e.g.*, Ex. 34 (FG00130729 (D. Thue warning against disclosing rewrite option during FFRs and writing that "[o]bviously we're trying to limit rewrite activity")); Ex. 33 (FGI00130678).

Civil Action No. 1:17-cv-00088-LY— Plaintiffs' Motion for Class Certification

Agents in Texas were understandably terrified. For example, after one agent was rebuked by his DM for switching FA2 customers to FSPA beyond the "rule of 1-2%" he responded that he had not even rewritten his own FA2 policy to FSPA (or any of his staff) despite the fact that a "rewrite would actually save me over $500.00 per 6 months . . . ."[59]

### c. FGI Modifies Agent Compensation Structure to Further Discourage and Punish Rewrite Activity.

Another internal measure FGI deployed towards this end was "[m]anag[ing] agent behavior through incentives and active performance management,"[60] chiefly by adopting a bonus structure that punished agents financially for switching FA2 customers to FSPA. Having "[a]gent bonuses based partially on retention [] suffer if the customer moves" to FSPA was one of the "[v]arious strategies" discussed as early as 2013 to prevent rewrites.[61] In the FSPA "Agency Guide," FGI warned agents that "[r]ewrite activity is included in the agency retention ratio calculation and may reduce your retention ratio if a significant number of FA[2] policies are rewritten."[62] A similar communication appeared in "FAQs" presented to the agents.[63] Mr. Swope confirmed at his deposition that FSPA rewrite activity negatively affected agent bonuses.[64]

Around the time of FSPA's launch, FGI also developed an "agent management tool" to identify agents for possible agency termination and other negative consequences.[65] FGI designed the tool to further discourage and punish rewrite activity. Specifically, as profitability and retention were measured as part of the tool,[66] FGI made sure that rewrites would affect both negatively. Rewrites reduced agents' profitability numbers—they resulted in what FGI

---

[59] Ex. 43 (FGI00148173 at 74).
[60] Ex. 48 (FGI00215194 at 201).
[61] Ex. 59 (FGI00230309 at 12).
[62] Ex. 20 (FGI00024634 at 51).
[63] Ex. 21 (FGI00024671 at 74).
[64] Ex. 6 (Swope Dep. 247:5-25).
[65] Ex. 9 (Tran Dep. 207:19-208:19).
[66] *Id.* at 208:14-19.

internally called "artificial premium drain" because premiums under FSPA were considerably lower but FGI expected to incur the same insurance losses before and after the rewrite[67]—and also negatively impacted agents' retention ratings—in the limited instances when customers were rewritten to FSPA, FGI conveniently did not consider that customer to have been "retained" by the agent for purpose of that agent's retention rating.[68] Mr. Tran confirmed at his deposition that the tool resulted in the termination of agencies in Texas.[69]

### d. FGI Fabricates Negative Impacts of Switching to FSPA.

For those FA2 customers who managed to learn about FSPA despite FGI's efforts to the contrary, FGI misled them that they would lose certain "benefits" if they switched to FSPA. For example, any FA2 customer being rewritten to FSPA was required to first sign a Policyholder Cancellation and Rewrite Agreement ("Rewrite Agreement").[70] The Rewrite Agreement falsely suggested that FA2 provided significantly greater coverage than FSPA.[71]

The Rewrite Agreement also misled customers about the supposed forfeiture of "free" Farmers Auto Rewards ("FARs") if the customer switched to FSPA. The Rewrite Agreement states that "you currently receive . . . Farmers Auto Rewards on your existing policies at no extra charge" and that such benefits are either unavailable in FSPA or available "at an additional cost to you."[72] In December 2014, FGI had similarly told FA2 customers they were being gifted with the FARs "at no additional charge."[73] In reality, as FGI's Doi Tran admitted, FARs were not free,

---

[67] *Id.* at 210:18-211:4; Ex. 7 (Mak Dep. 67:21-70:2); Ex. 10 (Procopio Dep. 176:17-178:5).
[68] Ex. 9 (Tran Dep. 205:16-21); *see also* Ex. 20 (FGI00024634 at 51).
[69] Ex. 9 (Tran Dep. 207:19-208:19).
[70] Ex. 65 (FGI00243923); *see also* Ex. 10 (Procopio Dep. 188:2-21).
[71] Ex. 65 (FGI00243923 (warning of "coverage differences" between FA2 and FSPA)).
[72] *Id.*
[73] Ex. 19 (FGI00009979 ("at no additional cost")); *see also* Ex. 14 (FGI00000017 at 19).

but rather FA2 customers were in fact paying for them.[74] An internal FAQ document describes the nature of the FAR charges to FA2 customers:

> **[Q]** Accident Forgiveness looks great, but are we taking rate to offset the surcharges we will not apply to the customers who receive this benefit?
>
> **ANSWER**: Our consumer research indicates that the benefit of accident forgiveness product feature is valued very highly by customers. The research suggests the small rate offset (increase) we must take to offer this feature will be more than made up for by the retention benefit we expect to gain.[75]

### e. FGI Imposes Procedural Hurdles to Switching to FSPA.

For the tiny fraction of FA2 customers who managed to learn about FSPA, FGI imposed additional hurdles to make it more difficult, and thus less likely, for them to switch to FSPA. As FGI's Head of Sales in Texas, Dave Thue, summarized: "Obviously we are not encouraging rewrites or trying to make this an easy process."[76] That was an understatement.

Among the hurdles FGI erected was to only permit rewrites to occur on the same day an FSPA quote was generated, which provided customers with little time to evaluate FGI's (bogus) claims of coverage differences and loss of "free" FARs.[77] Moreover, to punish the customer's agent for allowing the rewrite process to get this far, FGI forces the agent to pay out-of-pocket for ordering the customer's driver record (used to generate quotes) if the customer does not rewrite that day.[78]

### 4. FGI's Policy Has Been Very Successful, Resulting in the Categorical Differential Treatment Between Existing and New Customers.

Since FSPA's launch, the vast majority (~95%) of FA2 customers have remained walled off in FA2, resulting in the continuing categorical differential treatment between existing and

---

[74] Ex. 9 (Tran Dep. 77:21-23 ("Not directly, but yeah.")).

[75] Ex. 23 (FGI00040494 at 96). Plaintiffs note that FGI's false marketing of the FARs may constitute a separate violation of Chapter 541 of the Texas Insurance Code.

[76] Ex. 42 (FGI00142627).

[77] Ex. 9 (Tran Dep. 121:1-122:21).

[78] Ex. 21 (FGI00024671 at 76 (Agent FAQs stating that "if the MVR is run and the rewrite does not occur, the agent will be charged for the cost of the MVR")).

new customers that FGI desired. As of January 2016, there were a total of 729,477 Farmers

Texas customers with FA2 policies.[79] All or virtually all of them were eligible for FSPA (but for

FGI's internal policy), and at least the vast majority of them would have received some premium

savings from switching. Nevertheless, as a testament to the effectiveness of FGI's internal

rewrite cap, threats to agents, and other measures aimed at concealing FSPA and preventing

FSPA switches, as of March 2018 (over two years after FSPA was rolled out in Texas), only

approximately 5.3% of the FA2 customers had been switched to FSPA, and many of those were

not rewritten until many months or even years after FSPA launched.[80]

### C.     <u>FGI Repeatedly Misleads The TDI About FSPA.[81]</u>

FGI also deliberately misled the TDI in multiple respects in connection with FSPA.

*First*, at the same time FGI was internally planning a multi-part scheme of keeping FA2

customers from accessing FSPA, FGI told TDI a very different story. FGI did not tell TDI about

FGI's internal plan to severely restrict rewrites.[82] To the contrary, FGI amazingly told TDI that

FSPA would be easily accessible to FA2 customers,[83] and that the agents would actively

communicate FSPA to existing customers.[84] In reality, FGI severely precluded rewrites and

actively discouraged and even penalized such agent communications.

---

[79] Ex. 11 (Def.'s Resp. to Pl.'s Interrog. No. 3).

[80] Def.'s Resp. to Pl.'s Interrog. No. 6 & Suppl. Chart (showing ~5.3% rewritten as of March 2018)).

[81] Plaintiffs' original sealed Motion for Class Certification included a more detailed recitation of facts regarding FGI's efforts to mislead TDI. (Dkt. No. 113-1, at 14-16.) After the Court entered its Order denying in part Plaintiffs' Motion to Seal with respect to the sealed brief (Dkt. No. 116), Plaintiffs conferred with FGI regarding re-filing the Motion for Class Certification. FGI agreed that it would waive any confidentiality concerns regarding the remainder of the brief so long as this portion of the brief (Section III.C.) was modified, which Plaintiffs agreed to do. Plaintiffs intend to challenge several of FGI's confidentiality designations, including as to several of the exhibits filed concurrently with this Motion.

[82] Ex. 9 (Tran Dep. 173:8-22).

[83] Ex. 61 (FGI00231434 at 35); Ex. 9 (Tran Dep. 169:19-170:3).

[84] Ex. 53 (FGI00216755 at 64); Ex. 9 (Tran Dep. 174:6-176:20). Apparently, FGI had tried to sell this same message to other state departments of insurance. Ex. 51 (FGI00216156 at 62).

*Second*, FGI knowingly misled the TDI regarding the premium differences between FA2 and FSPA. As discussed above, before launching FSPA in Texas, FGI conducted an internal comparative analysis of 100,000 actual FA2 policies, calculating that FA2 policyholders would save an average of 19.8% under FSPA.[85] FGI withheld the results of this analysis from the TDI.[86] Instead, FGI provided the TDI on October 12, 2015, with the results of an *earlier* analysis that reflected an average premium savings of 8.5% under FSPA. At the time of presenting it to TDI, FGI knew that this earlier analysis significantly understated the expected premium differences because it used outdated rates—it did not take into account the directive from senior management to lower FSPA's launch rates a further 10% (*see supra* at III.B.2) nor the already-decided upon significant increase to FA2 rates that took effect in December 2015 (*see supra* at III.B.2), before FSPA's launch in Texas.[87] Mr. Tran could not explain why FGI knowingly gave the TDI an inaccurate (much smaller) number.[88]

### D.    FGI's Discriminatory Conduct Defies FGI's Own Risk Analyses.

It is evident that FGI's sole criteria in implementing its ubiquitous preclusive plan was simply whether a customer was or was not an existing FA2 customer as of January 4, 2016 (FSPA launch date in Texas). As quoted *supra*, at III.B.3, FGI's "Farmers Smart Auto Plan

---

[85] Ex. 5 (Tai Dep. 184:12-18, 211:16-23, 215:25-216:7); Ex. 9 (Tran Dep. 148:1-15).
[86] Ex. 9 (Tran Dep. 158:12-18).
[87] Ex. 16 (FGI00002592) & Ex. 15 (FGI00002555) (Oct. 12, 2015 correspondence to TDI including the results of the earlier 8.5% premium level difference analysis); Ex. 5 (Tai Dep. 132:22-25, 133:21-24, 158:14-159:12); Ex. 9 (Tran Dep. 153:7-12); *see also* Ex. 31 (FGI00116692 at 97 [Tran Dep. Ex. 150] (Meeting on Oct. 13, 2015 – literally the next day – discussing actual expected premium level difference in Texas); Ex. 9 (Tran Dep. 137:5-142:3, 147:14-148:19 (testifying about that Oct. 13, 2015 meeting and slides used at that meeting circulated Oct. 12, 2015); Ex. 32 (FGI00118178) (post-meeting correspondence confirming discussions on the subject).
[88] Ex. 9 (Tran Dep. 151:2-158:18); *see also* Ex. 53 (FGI00216755 at 759, 764 (talking points on rate level difference)).

Agency Guide," presented to agents before FSPA's launch, stated FGI's simplistic criteria in no uncertain terms—FA2 customers were to stay in FA2.[89]

FGI nevertheless has indicated it intends to defend its conduct on the grounds that it was "actuarially sound and non-discriminatory."[90] As Plaintiffs' actuarial expert, Allan Schwartz, explains, this defense is well-suited to adjudication on a class-wide basis.[91] While it is premature to resolve the merits at this stage, notably FGI's categorical differential treatment of existing customers vis-à-vis new customers defies FGI's own risk analyses.

FGI's "Greening Curve" studies analyzed the level of risk posed by FGI customers at inception (i.e., onboarding as new business) and at each additional year of "tenure" the customers have with FGI. Those studies, which FGI has updated several times, have uniformly shown that less tenured customers are riskier (i.e., higher loses) than more tenured customers, and that new customers (with zero tenure) are the riskiest of all.[92]

Multiple FGI witnesses confirm that existing business is less risky. Senior Actuary Helen Tai testified that "based on our historical experience, we tend to see that policies with zero tenure perform worse than policies with longer tenure."[93] Don Procopio agreed that new customers have higher loss ratio relativities than existing business at any point of tenure.[94] Dana Lutz testified that the Greening Curves (which analyzed actual Farmers data) consistently showed that less tenured business has higher loss ratios than more tenured business, and that new business has the highest loss ratios of all.[95] Geoffrey Mak agreed it is "generally accepted that more tenured

<hr>

[89] Ex. 20 (FGI00024634 at 636).
[90] ECF No. 104 at 15.
[91] Ex. 2 (Schwartz Decl. ¶¶ 10-17).
[92] *See, e.g.*, Ex. 60 (FGI00230580 at 82-83) ("Loss Ratios decrease over time for longer tenured business").
[93] Ex. 5 (Tai Dep. 296:21-24).
[94] Ex. 10 (Procopio Dep. 59:16-60:21).
[95] Ex. 8 (Lutz Dep. 82:19-83:4, 63:4-16).

policyholders are less risky than less tenured policyholders[.]"[96] Indeed, FGI has admitted as much in a verified interrogatory response."[97]

Actuarial expert, Allan Schwartz, likewise confirms this is the case:

> It is generally recognized in the property / casualty insurance business that longer tenured policyholders have more favorable loss experience (i.e., lower losses) than new or less tenured policyholders. It appears that this is consistent with Defendant's internal findings with respect to its own policyholders. "Greening Curve" analyses, performed by Defendant in 2013 and updated periodically thereafter, have shown that longer tenured customers generally have better experience than less tenured customers, and that new customers (with no tenure) generally have the worst experience.[98]

And yet under FGI's preclusive scheme, categorically, new customers receive FSPA and its generally lower rates while existing, tenured customers are walled off in FA2 paying higher rates and artificially precluded, by internal company policy, from accessing the lower rates.

**E. FGI's Documents and Witnesses Undercut Its Contentions Regarding Supposed Coverage Differences Between FA2 and FSPA.**

FGI also intends to argue that supposed material coverage differences between FA2 and FSPA preclude any finding that its conduct constitutes unfair discrimination. The coverages under FA2 and FSPA comprise "packages" that do not vary between customers within each book; thus, comparing coverages here is an inherently common exercise.[99] Although still ongoing, the discovery to date strongly supports Plaintiffs' allegation that the coverages under FA2 and FSPA are not, in fact, materially different.

FGI's early consideration and development of open/closed and FSPA did not appear to contemplate any coverage differences and, in fact, predated FGI's creation of the FSPA policy form. None of the early developmental documents suggest that the new, "open" book in the

---

[96] Ex. 7 (Mak Dep. 85:22-25); *see also id*. at 168-170.
[97] Ex. 12 (Def.'s Resp. & Obj. to Pl.'s Interrog. No. 11). ("The property and casualty industry has seen that expected loss costs are greater for new business than for renewal business").
[98] Ex. 2 (Schwartz Decl. ¶ 26).
[99] Ex. 3 (Averill Decl. ¶¶ 13-15).

scheme would have materially different coverage than the "closed" book. As FSPA came closer to fruition, discussions about the form reflected an assessment that "[o]verall the [existing FA2] coverages are correct and comparable to your competitors[,]"[100] and that the "general sense is that our auto contract isn't that far off the mark, so the review will likely produce relatively little change."[101] Likewise, in mid-2016 after FSPA launched, FGI's Doi Tran told Farmers Texas agents that "[t]he new Smart Plan Auto contract is very similar to the old [FA2] contract[.]"[102]

As the Court will recall from an earlier-filed motion to compel in this case,[103] FGI created certain side-by-side comparison charts, identifying supposed "differences" between FSPA and FA2 coverages.[104] FGI states that these charts identify the coverage differences FGI contends exist between FA2 and FSPA.[105] As established by Mr. Tran's testimony, however, the charts are not reflective of the actual FA2 and FSPA coverages in Texas during the class period, are misleading, and contain several inaccuracies. As expert Michael Averill explains: "It appears that these [charts] may have been constructed not to objectively compare the actual coverages under the two plans, but to give the impression that FSPA and FA2 provided materially different coverage, in order to try to help justify using the open-closed book approach FGI adopted."[106]

The FSPA contract creation process began with a countrywide template, that was then modified to account for any state-specific statutes or regulations that dictated specific policy language.[107] Apparently, FGI decided to "just use the countrywide template to do the comparison charts.[108] Comparing a Texas-specific policy (FA2) to a countrywide template (not Texas

---

[100] Ex. 45 (FGI00214503 at 507) (F. Cripe authored document).
[101] Ex. 57 (FGI00230165) (D. Procopio authored document).
[102] Ex. 55 (FGI00221868).
[103] ECF Nos. 90, 94.
[104] Ex. 17 (FGI00009284); Ex. 18 (FGI00009287).
[105] Ex. 11 (Dft's Resp. to Plt.'s Interrog. No. 4); ECF No. 100.
[106] Ex. 3 (Averill Decl. ¶ 21).
[107] Ex. 9 (Tran Dep. 29:17-30:16 ("We would need to change it to comply with state[] law.")).
[108] Ex. 62 (FGI00231439).

specific) would give the impression of more policy language differences than would ultimately be present after the policy had been reviewed for compliance with Texas law.[109]

Mr. Tran also acknowledged that by the time FSPA launched in January 2016, the FSPA policy form had undergone "a lot of edits" from the earlier draft FSPA policy form.[110] Because those edits to FSPA were made after the comparison charts were created, they are not reflected in the charts.[111] Mr. Tran further admitted that the FA2 portion of the charts was also inaccurate at the time of FSPA's launch. For example, the charts indicated nearly a dozen supposed reductions in coverage from FA2 to FSPA due to a ride-share exclusion in the FSPA policy form. However, Mr. Tran admitted that FA2 also included a "similar [mandatory] endorsement" excluding ride-share as of January 4, 2016, and that the comparison chart failed to account for this and inaccurately stated that FA2 "will cover" ride-share when that was not the case.[112]

Mr. Tran further admitted that FGI removed an explanatory column that had been included in earlier versions of the comparison charts.[113] For approximately 37 chart entries showing supposed reductions in coverages in FSPA, the removed explanatory column reveals there may not be any difference in coverage at all between FA2 and FSPA. For these items (where the explanatory column said FA2 was "silent" as to the particular item), Mr. Tran was (and still is) unsure whether such "restrictions" in FSPA are also "excluded or not in the FA2" product.[114]

For many of the supposed coverage reductions in FSPA, where FA2 is characterized as "silent" in the deleted explanatory column, it appears likely that FSPA and FA2 are materially

---

[109] Ex. 9 (Tran Dep. 48:5-12, 52:6-11 ("compliance" refers to state law and regulations)).
[110] *Id.* at 21:11-24:1.
[111] *Id.* at 24:15-26:1 ("This isn't the final version that was approved.").
[112] *Id.* at 26:15-27:6, 32:16-21, 74:10-76:6.
[113] *Id.* at 35:12-36:19, 40:15-41:2.
[114] *Id.* at 44:5-20.

the same if not identical.[115] Indeed, going through at his deposition a 22-item list of the supposedly most significant coverage "differences" Mr. Tran had prepared, Mr. Tran was unable to affirmatively identify *any* of these 22 items as being areas where coverage under FSPA was actually less than under FA2 (though he was able to identify 4 items where FSPA coverage was expanded—*i.e.*, greater than FA2 coverage).[116] Perhaps this is why Mr. Tran described FSPA as a "better customer experience" than FA2.[117]

Internal FGI documents regarding rewrites further indicate that the coverages under FA2 and FSPA are not materially different. FGI internally referred to "[a]ny rewrites from FA2.0 to FSPA" as an "'<u>Artificial</u>' Cause[]" of "premium drain" because FGI "expect[s] to see little or no change in loss amounts as a result" of those rewrites.[118] Witnesses confirmed that FGI reasonably assumes that customers rewritten to FSPA are expected to have the same losses as if they had stayed in FA2.[119] Mr. Mak agreed "loss" in the insurance industry is "the amount of compensation paid or payable to the claimant <u>under the terms of the insurance policy</u>."[120] FGI's losses are a direct function of paying claims "according to the terms of our policy contract[.]"[121]As stated by Mr. Averill,[122] this assumption of expected losses remaining constant

---

[115] *See, e.g.*, Ex. 3 (Averill Decl. ¶¶ 20, 22, 23).
[116] Ex. 9 (Tran Dep. 71:21-92:12); *see also* Ex. 3 (Averill Decl., ¶¶ 19-27) (stating preliminary assessment that the coverages under FA2 and FSPA appear to be materially the same).
[117] Ex. 9 (Tran Dep. 238:17-21).
[118] Ex. 24 (FGI00041941 at 45 [Mak Dep. Ex. 81]).
[119] Ex. 7 (Mak Dep. 67:21-68:11, 69:21-70:2 (a "fair assumption to make" and the "best assumption"), 127:18-131:24 (FGI assumed rewritten policies presented the "exact same exposures" and "the inherent risk exposure of the customers hasn't changed as a result of rewriting from one book of business to another"), 131:1-7 (comparison of FA2 and FSPA rewrites constituted "an apples-to-apples comparison"); Ex. 5 (Tai Dep. 295:14-296:1); Ex. 9 (Tran Dep. 115:18-119:1) ("I felt our assumption was reasonable."); Ex. 8 (Lutz Dep. 279:20-280:6) ("I think it's a fair assumption they'll be similar.").
[120] Ex. 7 (Mak Dep. 31:17-25) (emphasis added).
[121] *Id.* at 36:5-11.
[122] Ex. 3 (Averill Decl. ¶ 27).

"would suggest that the coverages under the two polices are not materially different, since losses (what the insurer pays out to insureds) is a direct function of coverages under the policies."[123]

## F. Plaintiffs Are Among the Numerous FA2 Customers Subjected to FGI's Discrimination.

Plaintiffs have all been FA2 policyholders in Texas during the class period (i.e., January 4, 2016 to the present), and all of them have been subjected to FGI's alleged discrimination.

Plaintiff Charles Grigson has been a Farmers customer for over 30 years. From the time of FSPA's Texas launch until June 2016, he had two FA2 policies. In April and May 2016, he received renewal offers for his FA2 polices, at a combined price of $3053.00 for the two policies. In these renewal offer letters, FGI said he was being given certain benefits "in recognition of your continued business with Farmers."[124] FGI did not tell Mr. Grigson about FSPA or its generally lower rates.[125] Despite FGI's efforts to the contrary, in May 2016 Mr. Grigson managed to learn about FSPA and requested a side-by-side comparison from his agent, which showed he would save a total of $612.40 by switching to FSPA.[126] On June 2, 2016, he switched to FSPA.[127] Mr. Grigson's FA2 premiums between January and May 2016 were higher than the contemporaneous FSPA premiums for the same or materially the same coverages.[128]

Plaintiff Lisa Hoing has been a Farmers customer since 2015. From the time of FSPA's launch in Texas until the present, she has had an FA2 policy. She has never had an FSPA policy. Ms. Hoing's FA2 policy has been renewed at least five times since January 4, 2016, the first renewal occurring in May 2016.[129] The FA2 renewal offer letters FGI sent her said she was being

---

[123] Mr. Mak agreed. Ex. 7 (Mak Dep. 37:13-15) (explaining that "[i]f there was a higher amount of coverage, then, yes, I would expect the potential losses to be higher"); *see also id.* at 39.
[124] FAC ¶ 72; ECF No. 104 at ¶ 72; Ex. 66 (PLTF00000051); Ex. 67 (PLTF00000063).
[125] FAC ¶ 71.
[126] FAC ¶ 76.
[127] FAC ¶ 80; Ex. 72 (PLTF00000049) (showing lower FSPA premium).
[128] FAC ¶ 77.
[129] FAC ¶¶ 83-84; ECF No. 104 at ¶¶ 83-84

financially rewarded for her "continued business with Farmers."[130] FGI has never told Ms. Hoing about FSPA or its generally lower rates.[131] For one or more policy period since FSPA was launched in Texas, Ms. Hoing's FA2 premiums were higher than the contemporaneous FSPA premiums for the same or materially the same coverages.[132]

Plaintiff David Kelly has been a Farmers customer for over 20 years. From the time of FSPA's launch in Texas until November 2017, he had an FA2 policy. During that time, his FA2 policy was renewed multiple times. His FA2 premiums during this period ranged from $879.00 to $1064.00.[133] The FA2 renewal offer letters FGI sent said he was being given certain benefits "in recognition of your continued business with Farmers."[134] In November 2017, Mr. Kelly received an FA2 renewal letter, showing a price of $1,064 for his policy.[135] FGI did not tell Mr. Kelly about FSPA or its generally lower rates.[136] Despite FGI's efforts to the contrary, in November 2017 Mr. Kelly learned about FSPA and requested and received a side-by-side comparison from his agent, which showed he would save $664 by switching to FSPA.[137] On or around November 28, 2017, he switched to FSPA.[138] For one or more policy period between January 2016 and November 2017, Mr. Kelly's FA2 premiums were higher than the contemporaneous FSPA premiums for the same or materially the same coverages.[139]

---

[130] FAC ¶ 88; Ex. 69 (PLTF00000322)
[131] FAC ¶¶ 85, 87.
[132] FAC ¶ 90.
[133] FAC ¶ 92-95.
[134] FAC ¶¶ 94; ECF No. 104 at ¶ 95.
[135] Ex. 71 (PLTF00000458).
[136] FAC ¶ 98.
[137] FAC ¶ 96.
[138] FAC ¶ 99; Ex. 70 (PLTF00000466) (showing lower FSPA premium).
[139] FAC ¶ 97.

## IV.    LAW AND ARGUMENT

### A.    Class Certification Is Appropriate Under Fed. R. Civ. P. 23(a) and (b)(3)

Class certification is appropriate if the proposed class meets the requirements of Rule 23(a) and at least one subsection of Rule 23(b). The trial court "maintains substantial discretion in determining whether to certify a class action." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998). "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007) (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004)); *City of Pontiac Gen. Employees' Ret. Sys. v. Dell Inc.*, No. A-15-CV-374-LY, 2018 WL 1558571, at *2 (W.D. Tex. Mar. 29, 2018).

### B.    The Rule 23(a) Elements Are Satisfied

#### 1.    Numerosity (Rule 23(a)(1))

Rule 23(a)(1) is satisfied when a potential class is so numerous that joinder of all members is impracticable. There is no magic minimum number. It is sufficient that plaintiff presents "some evidence" or a "reasonable estimate" of the number of purported class members. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001); *Serna v. Transp. Workers Union of Am.*, No. 3:13-cv-2469-N, 2014 WL 7721824, *2 (N.D. Tex. Dec. 3, 2014).

Numerosity is easily satisfied here. Plaintiffs seek certification of a class comprised of: "All Farmers Texas auto policyholders who had an active FA2 policy in effect on or after January 4, 2016." [140] According to FGI, there were approximately 729,477 Farmers Texas

---

[140] FAC ¶ 101.  The FAC's class definition also included a reference to "FA2.5"; however FGI has represented, and discovery confirms, that FGI did not issue any FA2.5 policies in Texas.

customers with FA2 policies at the start of the class period.[141] Joinder of that many persons, dispersed throughout Texas, would be impracticable and highly inefficient.

## 2. **Commonality (Rule 23(a)(2))**

Rule 23(a)(2) requires at least one common issue of fact or law "capable of class-wide resolution," and whose resolution will resolve "an issue that is central to the validity of each one of the [class member's] claims in one stroke.'" *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017) (citing each *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)); *Serna*, 2014 WL 7721824, at *3. A single common question of law or fact is sufficient if it meets the foregoing criteria. *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (citing *Wal-Mart*, 564 U.S. at 350).

The sole cause of action in this case raises several fundamental questions that are common to the class, including: (a) whether FGI employed an internal scheme of almost entirely precluding existing FA2 customers from FSPA and its rates, resulting in the categorical differential treatment of existing customers vis-à-vis new customers; (b) whether FGI's conduct constituted unfair discrimination under Tex. Ins. Code § 544.052; (c) whether FGI's conduct was "based on sound actuarial principles"; and (d) whether FGI's alleged violations were "knowingly committed" so as to qualify for the imposition of civil penalties under Tex. Ins. Code § 544.054(e). These questions are common to the class, will be resolved for the class in one stroke, and the answers will substantially drive the resolution of this case. While FGI may disagree with Plaintiffs on the merits of these common questions, that is no basis for denying certification. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013) (That plaintiffs or defendant may prevail on the *merits* does not defeat certification; "[a] failure of proof on the common question…ends the litigation and thus will never cause individual questions…to overwhelm questions common to the class.").

---

[141] Ex. 11 (Def.'s Resp. to Pl.'s Interrog. No. 3) (Plaintiffs note, for clarity, that the vast majority of the FSPA customers listed in this chart are *new Farmers customers* and not FA2 rewrites.

Additionally, FGI apparently will argue that its conduct is not unfairly discriminatory because of supposed material coverage differences between FA2 and FSPA. This affirmative defense raises another common question well suited to class adjudication. The coverages under FA2 and FSPA comprise defined "packages," and the question (and the answer) of whether those packages are materially the same or different will be the same for the entire class.[142]

It is possible that some minority of the class, under the proposed definition, may not have suffered monetary damages. FGI has thus far been unwilling to produce class-wide data. It is clear under Fifth Circuit precedent, however, that a class may be properly certified notwithstanding the fact that it may contain some minority of class members who did not suffer economic damages. *In re Deepwater Horizon*, 739 F.3d 790, 812-813 (5th Cir. 2014) (At the class certification stage, "the court [need] not determine whether the class contained individuals who have not actually suffered any injury, because this would have amounted to a determination of the truth or falsity of the parties' contentions, rather than an evaluation of those contentions' commonality"); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009) ("Class certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct."); *accord Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) ("PIMCO argues that before certifying a class the district judge was required to determine which class members had suffered damages. But putting the cart before the horse in that way would vitiate the economies of class action procedure….[A] class will often include persons who have not been injured by the defendant's conduct.").

---

[142] *See* Ex. 3 (Averill Decl., ¶¶ 13-14) (explaining that the coverages under each policy comprise defined packages and thus comparing the coverages is an "inherently common exercise"); Ex. 11 (Def.'s Resp. to Pl.'s Interrog. No. 4) (asserting supposed coverage differences are set forth in a common chart and the policy forms).

The discovery taken to date indicates that at least the vast majority of putative class members have incurred some discrimination damages.[143] As discussed below (*infra* Section IV.C.1.b), class members' damages can be measured here using a common, automated tool designed by FGI itself.

### 3. Typicality (Rule 23(a)(3))

Typicality, under Rule 23(a)(3), is satisfied if the representative plaintiffs' claims and those of the class arise out of the same course of conduct and share the same legal theory. *See James*, 254 F.3d at 571; *Serna*, 2014 WL 7721824, at *4. Typicality does not require "complete identity of claims," and is not defeated merely by factual differences. *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002). Here, the plaintiffs' and other class members' claims arise from the same common course of conduct, and are based on the same legal theory—that FGI's conduct constitutes unfair discrimination in violation of Tex. Ins. Code § 544.052. Plaintiffs, like the other class members, have had an FA2 policy in Texas during the class period and were subject to FGI's alleged discrimination.

### 4. Adequacy (Rule 23(a)(4))

Rule 23(a)(4) looks at: "(1) the zeal and competence of the representatives' counsel; (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017); *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005).

---

[143] *See, e.g.,* Ex. 5 (Tai Dep. 218:1-219:12, 248:2-249:6) (30(b)(6) testimony agreeing that under FGI re-rate analysis, "vast majority" of FA2 households saw premium reduction under FSPA); Ex. 44 (FGI00153752 at 71) (FSPA rates on average 20% lower than FA2 rates when FSPA launched); Ex. 11 (Def.'s Resp. to Pl.'s Interrog. No. 2 & Suppl. Chart (FGI00031363) (average FA2 and FSPA premiums on a monthly basis, the latter consistently lower every month)); Ex. 10 (Procopio Dep.177:22-178:5) ("Our observations of rewritten customers were that they were experiencing a 20 to 25 percent decrease off of [their] premium in FA2."); Ex. 9 (Tran Dep. 147:14-25; 211:5-24).

Plaintiffs here have demonstrated their willingness and ability to serve as class representatives. They have actively participated, *inter alia* providing information and documents, reviewing pleadings, helping respond to interrogatories, and remaining in regular contact with their counsel. They remain fully committed to prosecuting this case on behalf of the class.[144]

Plaintiffs have also protected the class's interests by retaining counsel with substantial pertinent experience. As set forth in their accompanying declarations, proposed Class Counsel are highly qualified, experienced litigators with extensive experience prosecuting class actions and complex matters involving insurance, consumer protection, and other issues. They have vigorously prosecuted this case since inception and remain fully committed going forward.[145]

Moreover, the plaintiffs' interests are aligned with and not in conflict with the interests of the proposed class. Plaintiffs and the proposed class members all share a strong interest in ensuring that FGI's discrimination is remedied and enjoined. Plaintiffs do not presently anticipate the need for any sub-classing in this case.

### C.   Rule 23(b)(3) Is Satisfied

In addition to satisfying the requirements of Rule 23(a), this case also satisfies Rule 23(b)(3), which requires that "questions of law or fact common to the class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *City of Pontiac*, 2018 WL 1558571, at *5.

### 1.   Common Questions of Law and Fact Will Predominate At Trial

Rule 23(b)(3)'s predominance inquiry looks at whether "*questions* of law or fact common to the class will predominate over any questions affecting only individual class members as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis original, internal quotes omitted). In

---

[144] Grigson Decl. (App. D); Hoing Decl. (App. E); Kelly Decl. (App. F).
[145] Davis Decl. (App. A); Heller Decl. (App. B); Longley Decl. (App. C).

conducting this inquiry, the court "consider[s] how a trial on the merits would be conducted if a class were certified." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (citation and internal quotation marks omitted). Rule 23(b)(3) does not require plaintiff "to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate"* over individual questions. *Amgen*, 568 U.S. at 469 (emphasis original, citations and internal quotations omitted).

The resolution of this case will be driven by core questions that are common to the class and very well suited for class-wide adjudication. Plaintiffs seek certification of a single cause of action, the elements of which are: (a) defendant is a "corporation, association, partnership, or other legal entity engaged in the business of insurance" (Tex. Ins. Code § 544.051); (b) defendant "in any manner engage[d] in unfair discrimination or permit[ed] unfair discrimination between individuals of the same class and of essentially the same hazard, including unfair discrimination in…the amount of premium, policy fees, or rates charged for a policy or contract of insurance"; and (c) economic damages. Moreover, Plaintiffs will seek imposition of civil penalties under Tex. Ins. Code § 544.054(e), which requires the additional showing that FGI's violations were "knowingly committed."

The predominant focus of the trial in this case will certainly be FGI's conduct, which was directed at the class as a whole, and not the individual circumstances of any class members. As discussed herein, both the liability and damages issues here are well suited to class-wide adjudication through common sources of proof. Common questions will predominate at trial.

### a.    FGI's Liability Is Subject to Common Proof

At the heart of this case is FGI's alleged scheme and whether it constitutes "unfair discrimination" under Tex. Ins. Code § 544.052. Liability issues in this case are well suited to class-wide adjudication through common sources of proof. Indeed, while discovery is ongoing,

the evidence Plaintiffs have collected to date already demonstrates an abundance of evidence confirming that FGI engaged in the alleged conduct and that such conduct was systemic, internal to FGI, and carried out pursuant to a deliberate, overall plan employed by FGI.

Plaintiffs will prove FGI employed a state-wide scheme of almost entirely precluding FA2 policyholders from accessing FSPA and its generally lower rates, resulting in the categorical differential treatment between existing and new customers, through, *inter alia*, the following common sources of proof:

- Documents showing that from the time FGI conceived of FSPA, it was fixated on aggressively keeping FA2 customers from FSPA, and adopted for Texas an internal "rule" that agents could not switch more than 2% of FA2 customers to FSPA.[146]
- Documents and testimony showing that FGI closely monitored rewrite activity and aggressively enforced the internal cap.[147]
- Agent materials and other evidence demonstrating that FGI employed several additional measures likewise aimed at discouraging and penalizing rewrites.[148]
- Testimony from senior FGI personnel, including Jim Swope (President of Farmers Texas and FGI's Head of Territory for Texas) confirming the scheme.[149]
- Data, including as summarized in FGI's interrogatory responses, regarding the very small percentage of Texas FA2 policyholders who were actually switched to FSPA.[150]
- Documents and testimony showing that FSPA rates have been generally lower than FA2 rates in Texas, including approximately 20% lower initially.[151]

These common sources of proof will not only demonstrate the existence and pervasive scope of FGI's conduct, but will also demonstrate its natural and intended result—i.e., FGI's categorical differential treatment between existing and new customers. The common proof will also show that FGI's internal scheme stood in stark contrast to FGI's representations to the TDI

---

[146] *See supra* Section III.B.3.a
[147] *See supra* Section III.B.3.b; Ex. 10 (Procopio Dep. 190:9-19).
[148] *See supra* Section III.B.3.
[149] Ex. 6 (Swope Dep. 86:12-87:3) ("We tried to limit the rewrites, yes."); Ex. 9 (Tran Dep. 198:1-199:3) (confirming 2% rule); Ex. 10 (Procopio Dep. 181:8-19 ) (limiting rewrites a "requirement" for the open/closed strategy); Ex. 7 (Mak Dep. 186:22-187:20, 192:21-193:10).
[150] *See supra* Section III.B.4.
[151] Ex. 44 (FGI00153752 at 71); Ex. 56 (FGI00222843 at 60); Ex. 11 (Suppl. Chart to Def.'s Resp. to Pl.'s Interrog. No. 2 (FGI00031363)).

that FA2 policyholders would have the "flexibility" to switch and that agents would be proactively communicating FSPA and the "option" to switch to FA2 customers.[152]

Plaintiffs will also use common proof to demonstrate at trial that FGI's conduct is unfairly discriminatory and not based on sound actuarial principles. As actuarial expert, Allan Schwartz, explains, the broad, generalized nature of FGI's scheme, the simplistic criteria FGI used (i.e., whether the customer was or was not an existing customer as of January 4, 2016), and common actuarial principles that will be applied, render these issues ideally suited to class-wide adjudication. Ex. 2, Schwartz Decl. ¶¶ 10-27. The common proof for these issues will include:

- Internal documents demonstrating that FGI's criteria in implementing its policy was simply whether or not a customer was an existing FGI customer as of January 4, 2016.[153]
- Internal documents and FGI witness and interrogatory admissions demonstrating that FGI's conduct *defied* FGI's own risk studies.[154]
- Expert testimony from actuarial expert, Allan Schwartz, explaining the applicable actuarial principles for determining whether FGI's conduct is based on sound actuarial principles, and his expert conclusions.

FGI intends to argue that supposed coverage differences between FA2 and FSPA preclude any finding that FGI's practice constitutes unfair discrimination.[155] While discovery on the issue is ongoing, Plaintiffs have already gathered substantial evidence strongly supporting that the coverages are the same or materially the same.[156] For purposes of the present motion,

---

[152] *Supra* Section III.C; Ex. 17 (FGI00009284 at 85) (existing customers will have "flexibility" to switch); Ex. 52 (FGI00216274 at 75) ("Newer product will be available for new business and existing customers in FA 2/2.5 will have option to be re-written to the Newer Auto product."); *id.* at 76 ("Customers can move the new product."); *id.* at 78: ("Highlight [to TDI] the role of agents in communication of the new option to existing customers."); *id.* at 84 ("We are building out communication to our agents to advise our customers of the option to switch product.").

[153] *See supra* Sections III.B-E.

[154] *See supra* Section III.D.

[155] Even assuming *arguendo* FGI *were* able to demonstrate that the coverages are materially different (which Plaintiffs obviously dispute), Plaintiffs disagree that this would preclude a finding of unfair discrimination, particularly since Tex. Ins. Code § 544.052 prohibits discriminatory treatment concerning "the benefits payable under a policy or contract of insurance [or] any of the terms or conditions of a policy or contract of insurance."

[156] *See supra* Section III.E; *see also* Ex. 3 (Averill Decl. ¶¶ 18-27).

because the coverages available under FA2 and FSPA comprise defined packages that do not vary by policyholder, evaluating whether FA2 and FSPA coverages are materially different is an inherently common exercise.[157] The question and answer on this issue will be the same for the entire class. The common proof will include:

- Expert testimony from Michael Averill comparing the FA2 and FSPA coverage packages as set forth in the FA2 and FSPA policy forms and corresponding amendatory endorsements to same.
- Charts prepared by FGI listing supposed "differences" between the FA2 and FSPA packages, along with: (a) expert evaluation of these supposed differences and; (b) evidence that these charts were prepared, not to objectively compare the coverages, but rather to give the misleading *impression* of material coverage differences.[158]
- Evidence, including FGI witness acknowledgements and expert testimony, that the comparison charts prepared by FGI do not reflect the actual FA2 and FSPA coverages in effect during the class period, and that the charts *repeatedly* suggest the existence of differences that do not exist.[159]
- Evidence that FGI reasonably assumed that if policyholders were switched from FA2 to FSPA, those policyholders' losses (a direct function of coverage) would stay the same, and expert testimony explaining the relevance of same.[160]

None of these liability issues will require individualized evidence. For all of these issues, common questions overwhelmingly will predominate over any individual issues, if any.

### b. Damages Are Amenable to Classwide Calculation Using a Common Mechanism That FGI Itself Developed.

At the class certification stage, it is sufficient that plaintiffs identify a method of measuring damages that is consistent with their theory of liability. *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 686 (5th Cir. 2015) (citing *Comcast Corp. v. Behrend*, 569 U.S. 26, 35 (2013)). That individual calculations may be required does not defeat class certification. *In re Deepwater Horizon*, 739 F.3d at 815; *Ibe*, 836 F.3d at 529 ("Generally, individualized damages calculations will not preclude a finding of predominance."); *Robbins v. Durham Sch. Servs., L.P.*, No. A-09-CA-609 LY, 2010 WL 11601207, at *6 (W.D. Tex. July 12, 2010), *report and recommendation*

---

[157] Ex. 3 (Averill Decl. ¶¶ 13-14).
[158] *See supra* Section III.E.
[159] *Id.*
[160] *Id.*

*adopted* 2010 WL 11601234 (W.D. Tex. Sept. 7, 2010) (citing cases); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) ("Although calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue.").

The proposed methodology must be reasonable, though it need not be perfect. *See Ludlow*, 800 F.3d at 683-685 ("[A] 'sound' methodology, [is] not certainty.") (quoting *Comcast*, 569 U.S. at 37); *Bell Atl. Corp.*, 339 F.3d at 304 (method sufficient if it will yield "a just and reasonable estimate of the damages"); *In re BP P.L.C. Sec. Litig.*, No. 10-MD-2185, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014), *aff'd sub nom.*, *Ludlow*, 800 F.3d 674 ("Approximating damages in any case is an imperfect science . . . . The [proposed] pre-explosion damages methodology contains its flaws, but it is not wholly arbitrary."). That is particularly so where the need for some approximation arises because of the defendant's own conduct. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 (2016); *BP P.L.C. Sec. Litig.*, 2014 WL 2112823, at *10 ("[T]he task of modeling damages in the Pre–Explosion Subclass period is made more difficult by virtue of the repetition of the allegedly misleading statements . . . which featured so prominently in Defendants' public relations materials.").

Here, Plaintiffs have identified a common methodology for measuring damages that is consistent with their theory of liability. As discussed further in the accompanying Fuller Decl, Plaintiffs propose measuring damages by calculating, for each class member and for each one of their FA2 policy period(s) during the class period, the savings under contemporaneous FSPA rates as compared to what they actually paid under FA2. This differential measurement directly tracks Plaintiffs' theory of unfair discrimination under Tex. Ins. Code § 544.052.[161]

---

[161] *See generally* Ex. 4A (Fuller Decl.); Ex. 4B (Suppl. Fuller Decl.). Damages for each class member can be calculated beginning January 4, 2016 (FSPA rollout date) or the class member's first FA2 renewal thereafter. The fact finder will decide which start date to apply for the whole

Moreover, while not necessary for class certification,[162] each class member's damages can be reasonably measured by automated means, using an "AOB Tool" *that FGI itself developed and has used repeatedly for the very purpose of comparing premiums under FA2 and FSPA.* While the magnitude of damages will vary among class members, and there may be some minority who did not suffer economic damages, the same common methodology will be used to perform the calculations for each and every class member. Individual differentials will be calculated for each class member, and the results of this methodology, in turn, can be presented to the fact finder in an organized manner at trial. *See generally* Ex. 4A (Fuller Decl.).

This calculation, for each class member and each policy period, involves two sides of an equation: (1) the FA2 premium the class member paid under FA2; and (2) a measurement of the corresponding FSPA premium under contemporaneous FSPA rates.

The first half of the equation is simple. FGI stipulates that it has the necessary data to confirm, for all FA2 policyholders in Texas, the start and end dates and the premium charged and paid for each FA2 policy during the class period.[163]

The second half of the equation is slightly more complex, but can be reasonably calculated, for each class member and each policy period, using *FGI's own* AOB Tool, which FGI developed and has used many times to compare premiums under FA2 and FSPA in Texas and elsewhere.[164] FGI has used its AOB Tool to calculate the impact on premiums of proposed rate changes within a given book ("Intra-Book AOBs").[165] FGI has also used its AOB Tool to take actual policyholder data for very large samples of FA2 policyholders, and calculate the

---

class; Plaintiffs' expert anticipates presenting calculations using both start dates. Ex. 4A (Fuller Decl., ¶¶ 33-34). For the small percentage who were switched to FSPA, their damages would stop when their FA2 policies ended.

[162] *See In re Deepwater Horizon*, 739 F.3d at 815

[163] Ex. 13 (Stip. of Def. Re Availability of Certain Data ("Data Stipulation"), ¶ 1).

[164] Ex. 5 (Tai Dep. 43:9-48:16).

[165] *Id.* at 42:22-43:8, 83:14-20.

difference between FA2 premiums and would-be FSPA premiums, under contemporaneous FA2 and FSPA rates ("New Book AOBs").[166]

As explained by FGI's Rule 30(b)(6) designee regarding the AOB Tool, on at least seven occasions in Texas alone, FGI has utilized the AOB Tool to perform New Book AOBs comparing FSPA and FA2 premiums for actual FA2 policyholders. For five of these New Book AOBs, FGI used the data for 100,000 actual Texas FA2 policies, and calculated differences, for each individual policy in the sample, between the FA2 and FSPA premiums using the applicable FA2 and FSPA rates for a given time period; after the differentials were generated for each individual policy in the sample, the results were then aggregated for reporting.[167]

For the Intra-Book AOB tools, FGI states that these tools replicate the actual premium amounts that are charged with essentially 100% precision.[168] With respect to the New Book AOBs, calculating the FSPA side of the equation requires the utilization of assumptions for certain data points. These assumptions are necessary because the FA2 policyholders in question are walled off in FA2 and not actually switched to FSPA (i.e., pursuant to FGI's discriminatory scheme), meaning FGI lacks certain data points that would be used in calculating their FSPA premiums that would be available had they switched.[169] For all other data points, FGI has the policyholders' pertinent data for calculating would-be FSPA premiums and thus assumptions are not required. FGI represents that, where assumptions were needed, the assumptions FGI utilized

---

[166] *Id.* at 12:24-13:17, 19:3-16, 31:13-32:18, 43:9-48:16, 112:15-113:1, 136:19-25, 138:4-18, 215:25-216:17, 218:1-219:12.
[167] *Id.* at 12:24-13:17, 19:3-16, 31:13-32:18, 43:9-48:16, 112:15-113:1, 136:19-25, 138:4-18, 215:25-216:17. 218:1-219:12. For the other two New Book AOBs performed regarding Texas, FGI has claimed privilege and thus Plaintiffs do not have information regarding the parameters used for these two. *Id.* at 47:25-48:5, 227:7-23; ECF No. 105 (Pls' Third Mot. to Compel Disc.).
[168] Ex. 25 (FGI00060789 at 798, 805); Ex. 5 (Tai Dep. 18:7-23); Ex. 13 (Data Stipulation ¶ 2).
[169] Ex. 5 (Tai Dep. 59:8-62:4).

for the existing New Book AOBs were reasonable, and that it is not aware of any different assumptions that would have been better to use.[170]

FGI has utilized the New Book AOBs for internal business purposes, in projecting and analyzing the premium differences between FA2 and FSPA at different points in time.[171] FGI has also built and utilized at least three New Book AOBs solely for purposes of this litigation.[172] For one of the New Book AOBs, FGI relied on the results of the tool to present (admittedly outdated) information to the TDI.[173] While the New Book AOBs require the use of certain reasonable assumptions as discussed above, FGI testified that it believes these tools provide the best possible and most accurate high-level estimate of premium level differences between FA2 and FSPA.[174] FGI is not aware of any better available tool for measuring these differentials.[175]

Expert David Fuller, has analyzed the New Book AOBs and FGI's testimony regarding same, and confirms that this tool can be utilized to reasonably measure damages in this case under the proposed methodology. These tools have repeatedly been run by FGI on very large samples of FGI's Texas FA2 book, and FGI does not dispute that the same policyholder data points are available to perform the same analyses for the entire FA2 book of business in Texas (i.e., the whole class).[176] As Mr. Fuller explains, a separate "edition" of the New Book AOB will need to be built to cover each window of time between the periodic FA2/FSPA rate changes that have occurred in Texas since FSPA was introduced.[177] Each such edition can be built by slightly modifying the existing editions of the tool that FGI has already built, utilizing the applicable

---

[170] *Id.* at 68:3-22, 69:6-11, 72:9-22.
[171] *Id.* at 53:14-21, 220:4-12.
[172] *Id.* at 53:1-54:8, 220:4-222:8.
[173] *Id.* at 132:22-25, 133:21-24, 158:14-159:12; Ex. 9 (Tran Dep. 151:2-158:18).
[174] Ex. 5 (Tai Dep. 49:18-25, 51:12-18, 67:8-68:1, 68:23-69:4, 175:11-20).
[175] *Id.* at 54:13-19, 69:24-72:8.
[176] Ex. 13 (Data Stipulation ¶ 2); Ex. 5 (Tai Dep.104:6-24, 105:22-106:22, 107:24-108:21).
[177] Each edition of the tool measures premium differences based on given sets of rates on the FA2 and FSPA sides, so a separate edition of the tool is needed for each window of time between each rate change.

rates for each window which FGI concedes are available and can be incorporated into the tool.[178]

Moreover, Mr. Fuller will review the assumptions (discussed above) that FGI used for the existing New Book AOBs to see if any adjustments to those assumptions may be appropriate. Any changes to the assumptions can be implemented as needed.[179]

Finally, as summarized by Mr. Fuller in his declaration, and as confirmed by FGI's Helen Tai, the New Book AOBs can be built and run under both "Rewrite" and "Re-Rate" scenarios. The former assumes that the FA2 policyholders are rewritten by FA2 into FSPA, while the latter assumes that the FA2 policyholders are re-rated (or "renewed")[180] into FSPA. The primary difference between the two is whether certain "rewrite factors" are applied in the calculation.[181] Plaintiffs propose that the tool can be built and run, under both the "Rewrite" and "Re-Rate" scenarios, with the fact finder making the ultimate determination.[182]

### c. Whether FGI's Conduct Was "Knowing" Is Subject to Common Proof

Tex. Ins. Code 544.054(e) gives the Court discretion to award civil penalties, of up to $25,000 per class member, if the fact finder finds that FGI "knowingly committed an act prohibited by Section 544.052." FGI's conduct here was not a series of isolated acts; rather, it was committed pursuant to a broad scheme and plan that FGI implemented state-wide. Accordingly, determining FGI's pertinent state of mind is another common question that is well-

---

[178] Ex. 5 (Tai Dep. 99:18-100:4, 249:15-21, 264:8-22).
[179] Ex. 4A (Fuller Decl. ¶ 31).
[180] "Re-rate" and "renewal" are used interchangeably in this context. Ex. 5 (Tai Dep. 54:20-55:17).
[181] Ex. 4A (Fuller Decl., ¶¶ 33-34); Ex. 4B (Suppl. Fuller Decl.); Ex. 5 (Tai Dep. 54:20-57:16, 58:5-13, 84:1-23, 99:22-100:4, 246:22-247:15, 249:15-21, 251:13-22, 252:3-20, 264:8-22).
[182] The fact finder will need to determine whether damages here should be measured based on a rewrite or re-rate scenario—i.e., whether, under the statute here, damages ought to measured based on comparing the class member to what that class member would have been charged had they been rewritten to FSPA at the outset, or based on comparing the class member to what an otherwise identically-situated new customer would have been charged.

suited to class-wide adjudication. Plaintiffs will prove that FGI's violations were "knowingly committed" through proof that is entirely common to the class, including:

- Documents and testimony confirming FGI's expectations and ongoing knowledge regarding the conduct and treatment of FA2 customers vis-à-vis new customers.[183]
- Documents showing that, in the time leading up to FSPA's rollout, FGI personnel was aware its plan raised discrimination and disparate treatment issues.[184]
- Evidence of FGI's efforts to mislead TDI about FSPA, including falsely telling TDI that FA2 customers would have the flexibility and option to switch to FSPA, and knowingly understating premium differences between FA2 and FSPA.[185]

### 2. A Class Action is Superior to Other Methods of Adjudication

In considering "superiority" under Rule 23(b)(3), courts analyze: (i) class members' interest in individually controlling their separate actions; (ii) the extent and nature of existing litigation by class members concerning the same claims; (iii) the desirability of concentrating the litigation in a particular forum; and (iv) the likely difficulties of managing a class action.

On the first two factors, the class members here have little if any interest in controlling the prosecution of separate actions. Plaintiffs are not aware of any other actions against FGI regarding the issues raised in this case. Given the size of each class member's damages—which are not insignificant but would be dwarfed by the expense of prosecuting a separate individual case—most class members would be unlikely to pursue individual claims. *Boos v. AT & T, Inc.*, 252 F.R.D. 319, 326 (W.D. Tex. 2008), *modified* (Sept. 17, 2008).

On the third factor, it would be far more efficient for the Court and the parties to have a single adjudication, rather than multiple separate cases about the same issues. *Id*. ("Courts within the Fifth Circuit have concluded that class certification is efficient if it would save time

---

[183] *See supra* at III.B.

[184] *See, e.g.,* Ex. 49 (FGI00215535) (discussing ways to avoid discrimination liability through making deliberately immaterial changes to coverages, including "chang[ing] UW or limits (i.e. 50,005 vs 50,000) to avoid discrimination risk"); Ex. 47 (FGI00215080) ("[R]egulatory risk of disparate treatment when multiple price points for one risk exist.").

[185] *See supra* at III.C.

and money.") (citing cases).  Moreover, because the class is dispersed throughout the state including within this District, this District is an appropriate forum.

On the fourth factor, a class trial on the single cause of action in this case will not present any significant manageability issues, if any at all. This case concerns a broad, state-wide scheme by FGI, and the trial will focus on same. Both liability and damages are subject to common proof, as discussed above. Consistent with Rule 23(b)(3), certification of this action as a class action would not only be superior to other methods, it is for all practical purposes the *only* method for fairly and efficiently litigating the claims of all members of the proposed class.

### D.      Class Notice Should Be Disseminated By a Court-Approved Administrator.

Class notice should be disseminated following the certification of the Class, pursuant to Fed. R. Civ. P. 23(c)(2)(B).  Plaintiffs propose that the Court enter a separate order regarding notice, following a ruling on class certification.  Plaintiffs propose that notice be disseminated by an appropriate Notice Administrator, subject to Court approval.  The Class consists of current and former Farmers Texas customers. Plaintiffs propose that notice be disseminated directly to the class members using the contact information for them in FGI's files.

### V.      CONCLUSION

Plaintiffs respectfully request that the Court: (a) certify the following Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3): "All Farmers Texas auto policyholders who had an active FA2 policy in effect on or after January 4, 2016.";[186] and (b) appoint Plaintiffs' counsel (Slack Davis Sanger, LLP; Law Offices of Joe K. Longley, and Lieff Cabraser Heimann & Bernstein LLP) as

---

[186] Excluded from the Class are: (a) any Judge or Magistrate presiding over this action, and members of their families; (b) FGI and affiliated entities, including but not limited to FIE and Farmers Texas, within the Farmers Insurance Group of Companies, their employees, officers, directors, and licensed agents; (c) FGI's legal representatives, assigns, and successors; and (d) all persons who properly execute and file a timely request for exclusion from the Class.

Class Counsel pursuant to Fed. R. Civ. P. 23(g), and appoint Plaintiffs Charles Grigson, Lisa Hoing, and David Kelly as class representatives.

Dated: March 12, 2019

Respectfully submitted,

/s/ *John R. Davis*
Michael L. Slack (TX Bar 18476800)
John R. Davis (TX Bar 24099518)
SLACK DAVIS SANGER, LLP
2705 Bee Cave Road, Suite 220
Austin, TX 78746
Tel.: 512-795-8686
Fax: 512-795-8787
mslack@slackdavis.com
jdavis@slackdavis.com

Joe K. Longley (TX Bar 00000114)
LAW OFFICES OF JOE K. LONGLEY
3305 Northland Drive, Suite 500
Austin, TX 78731
Tel.: 512-477-4444
Fax: 512-477-4470
joe@joelongley.com

Roger N. Heller (CA Bar 215348) (*pro hac vice*)
Jonathan Selbin (NY Bar 3948684) (*pro hac vice*)
Michelle A. Lamy (CA Bar 308174) (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel.: 415-956-1000
Fax: 415-956-1008
rheller@lchb.com
jselbin@lchb.com
mlamy@lchb.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *John R. Davis*                

## CERTIFICATE OF CONFERENCE

The undersigned counsel certifies that he conferred in good faith with opposing counsel concerning the matters addressed in and the relief sought in this Motion, and that the Parties could not reach agreement except with respect to the Court's holding of an oral hearing.

/s/ *John R. Davis*