## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| CHARLES GRIGSON, LISA HOING, and DAVID KELLY, Individually and on behalf of all putative class members, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 1:17-cv-00088-LY |
| FARMERS GROUP, INC., a Nevada corporation, | § § § | |
| Defendant. | § § § | |

## DEFENDANT'S OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................... 1

II. BRIEF FACTUAL BACKGROUND ..................................................................... 2

    A.  The FA2 and FSPA Auto Insurance Policies ................................................ 3

    B.  TDI Approves an Open/Closed Rollout of the FSPA Policy With Different Rates ................................................................................................................ 5

    C.  Farmers Texas Launches FSPA .................................................................... 7

    D.  Plaintiffs, Their Sole Cause of Action, and The Putative Class Definition .......... 9

III. ARGUMENT AND AUTHORITIES ................................................................... 11

    A.  Legal Standard for Class Certification ........................................................ 11

    B.  The Putative Class Cannot Be Certified Because Plaintiffs Have Not Met Their Burden to Show Predominance ........................................................... 12

        1.  Legal Standard for Predominance ...................................................... 13

        2.  Plaintiffs' Liability Theory Cannot be Adjudicated on a Class-Wide Basis ........................................................................................ 14

            (a)  The Alleged Discriminatory Conduct Cannot be Proven on a Class-Wide Basis ................................................................. 14

            (b)  Causation is a Required Element of Plaintiffs' Claims and Cannot be Adjudicated Without Individualized Inquiry ............. 18

            (c)  Economic Harm is a Required Element of Plaintiffs' Claims and Will Require Individualized Inquiry to Adjudicate ........................................................................... 30

        3.  Plaintiffs' Theory and Model for Proving Damages Cannot be Adjudicated on a Class-Wide Basis ..................................................... 35

            (a)  Applicable Legal Standard for Rate "Discrimination" Damages ................................................................................... 36

            (b)  Plaintiffs' Proposed Damages Model is Legally and Factually Deficient ............................................................... 38

            (c)  Even Under Plaintiffs' Flawed Damages Theory, the Alleged Unfair Discrimination Damages Cannot Accurately Be Calculated on a Class-Wide Basis ...................... 41

    C.  The Putative Class Cannot be Certified Because Plaintiffs Have Not Met Their Burden to Satisfy the Rule 23(b)(3) Superiority Requirement .................. 46

    D.  The Putative Class Cannot be Certified Because Plaintiffs Have Not Met Their Burden to Satisfy the Typicality & Adequacy Requirements .................... 47

IV. CONCLUSION ..................................................................................................... 49

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Algarin v. Maybelline, LLC*,
300 F.R.D. 444 (S.D. Cal. 2014) ..................................................................26, 30

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ................................................................................42

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..............................................................................................13

*Avritt v. Reliastar Life Ins. Co.*,
615 F.3d 1023 (8th Cir. 2010) ........................................................................15, 18

*Bell Atlantic Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ...........................................................19, 35, 41, 42, 46

*Bell v. Ascendant Solutions, Inc.*,
422 F.3d 307 (5th Cir. 2005) ................................................................................12

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
242 F.3d 290 (5th Cir. 2001) ................................................................................46

*Bright v. Asset Acceptance, LLC*,
292 F.R.D. 190 (D.N.J. 2013)...............................................................................41

*Brown v. Mid-Am. Apartments, LP*,
327 F.R.D. 145 (W.D. Tex. 2018) .........................................................................14

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ................................................................................13

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ..............................................................................14, 47

*Collerain v. City of Granbury*,
760 S.W.2d 364 (Tex. App.—Forth Worth 1988, no writ.) ..................................37

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)................................................................................11, 22, 35, 46

*Corley v. Orangefield Indep. Sch. Dist.*,
152 F. App'x 350 (5th Cir. 2005) ..........................................................................46

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
829 F.3d 370 (5th Cir. 2016) ...................................................29, 32, 35

*Danna v. Air France*,
334 F. Supp. 52 (S.D.N.Y. 1971), *aff'd*, 463 F.2d 407 (2d Cir. 1972) ....................................37

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ...................................................34

*In re Deepwater Horizon*,
785 F.3d 1003 (5th Cir. 2015) ...................................................34

*Fairbanks v. Farmers New World Life Ins. Co.*,
197 Cal. App. 4th 544 (2011), *as modified* (Aug. 1, 2011) ...................................27

*Fairbanks v. Farmers New World Life Ins. Co.*,
No. B257386, 2016 WL 7131603 (Cal. Ct. App. Dec. 7, 2016) .....................................27, 28

*Frey v. First Nat'l Bank Sw.*,
602 F. App'x 164 (5th Cir. 2015) ...................................................32

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*,
695 F.3d 330 (5th Cir. 2012) ...................................................13

*Gene And Gene LLC v. BioPay LLC*,
541 F.3d 318 (5th Cir. 2008) ...................................................19, 30, 32

*Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*,
327 S.W.3d 118 (Tex. 2010)...................................................22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)...................................................12

*Homoki v. Conversion Servs., Inc.*,
717 F.3d 388 (5th Cir. 2013) ...................................................38

*Hughes v. Ester C. Co.*,
320 F.R.D. 337 (E.D.N.Y. 2017)...................................................41

*Ibe v. Jones*,
836 F.3d 516 (5th Cir. 2016) ...................................................35, 46

*Interstate Commerce Commission v. U.S., ex rel. Campbell*,
289 U.S. 385 (1933)...................................................36, 37

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
183 F.R.D. 217 (W.D. Mich. 1998)...................................................15

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
    193 F.R.D. 505 (W.D. Mich. 2000) ........................................................21

*Johnson v. Kansas City S. Ry. Co.*,
    208 F. App'x 292 (5th Cir. 2006) .......................................................33

*Kohen v. Pacific Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) .............................................................34

*Kousal v. Tex. Power & Light Co.*,
    179 S.W.2d 283 (Tex. 1944) ..............................................................37

*Langbecker v. Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir. 2007) .............................................................47

*In re LifeUSA Holding Inc.*,
    242 F.3d 136 (3d Cir. 2001).............................................................15

*Madison v. Chalmette Ref., L.L.C.*,
    637 F.3d 551 (5th Cir. 2011) .............................................................12

*Maxwell v. United Servs. Auto. Ass'n*,
    342 P.3d 474 (Colo. App. 2014) ........................................................30

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds by Bridge v.*
    *Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ....................................19, 26, 29

*Mims v. Stewart Title Guar. Co.*,
    590 F.3d 298 (5th Cir. 2009) .............................................................34

*Neely v. Ethicon, Inc.*,
    No. 1:00-CV-00569, 2001 WL 1090204 (E.D. Tex. Aug. 15, 2001) .....................14

*Norman v. League City Nat'l Bank*,
    No. 01-92-01112-CV, 1998 WL 135452 (Tex. App.—Houston [1st Dist.]
    Mar. 26, 1998, no pet.)....................................................................38

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
    910 F.Supp.2d 891 (E.D. La. 2012), *aff'd sub nom.*, 739 F.3d 790 (5th Cir.
    2014) ......................................................................................13

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
    100 F. App'x 296 (5th Cir. 2004) .......................................................33

*Pioneer Valley Casket Co., Inc. v. Serv. Corp. Int'l*,
    CV H-05-3399, 2008 WL 11395528 (S.D. Tex. Nov. 24, 2008) .........................42

*Poulos v. Caesars World, Inc.*,
  379 F.3d 654 (9th Cir. 2004) ..................................................................26, 29

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ........................................................................41

*Robinson v. Tex. Auto. Dealers Ass'n*,
  387 F.3d 416 (5th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005).........................18

*Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*,
  319 F.3d 205 (5th Cir. 2003), *cert. denied*, 540 U.S. 819 (2003)...............13, 19, 29

*Seeligson v. Devon Energy Prod. Co., L.P.*,
  753 F. App'x 225 (5th Cir. 2018) .....................................................12, 13, 32, 35

*Shivangi v. Dean Witter Reynolds, Inc.*,
  825 F.2d 885 (5th Cir. 1987) ..........................................................................20

*Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  482 F.2d 880 (5th Cir. 1973) ..........................................................................18

*Sistrunk v. TitleMax, Inc.*,
  No. SA14CA628RP(HJB), 2016 WL 9450445 (W.D. Tex. Aug. 26, 2016).........................34

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998), *cert. denied*, 524 U.S. 923 (1998).........................48

*Steering Comm. v. Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006) ......................................................................46, 47

*Stirman v. Exxon Corp.*,
  280 F.3d 554 (5th Cir. 2002) ..........................................................................47

*Sw. Bell Tel. Co. v. Metro-Link Telecom, Inc.*,
  919 S.W.2d 687 (Tex. App.—Houston [14th Dist.] 1996, writ denied)................................39

*Tesoro Ref. & Mktg. Co., L.L.C. v. Nat'l Union Fire Ins. Co.*,
  833 F.3d 470 (5th Cir. 2016) ..........................................................................22

*Tex. Commercial Energy v. TXU Energy, Inc.*,
  413 F.3d 503 (5th Cir. 2005), *cert. denied*, 546 U.S. 1091 (2006).........................39

*Ticknor v. Rouse's Enters., L.L.C.*,
  592 F. App'x 276 (5th Cir. 2014) .....................................................................18

*Turnbow v. Life Partners, Inc.*,
  No. 3:11-CV-1030-M, 2013 WL 3479884 (N.D. Tex. July 9, 2013)........................42

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ...................................................................................13, 46

*United Gas Corp. v. Shepherd Laundries Co.*,
    189 S.W.2d 485 (Tex. 1945) ....................................................................................37

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..............................................................11, 12, 29, 33, 35

*Waldon v. Williams*,
    760 S.W.2d 833 (Tex. App.—Austin 1988, no writ.) ............................................38

*Ward v. Hellerstedt*,
    753 F. App'x 236 (5th Cir. 2018) (per curiam) ....................................................47

*Wegoland, Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994) .......................................................................................39

*Winn v. Alamo Title Ins. Co.*,
    No. A-09-CA-214-SS, 2009 WL 7099484 (W.D. Tex. May 13, 2009), *aff'd*,
    372 Fed. App'x 461 (5th Cir. 2010), *cert. denied*, 562 U.S. 890 (2010) ................39

## Rules and Statutes

Fed. R. Civ. P. 23 ................................................................................1, 11, 12, 14, 29

Fed. R. Civ. P. 23(a)(4) ..........................................................................................47

Fed. R. Civ. P. 23(b)(3) ..........................................................12, 18, 19, 35, 46, 47

Tex. Ins. Code § 544.052 ...............................................................................9, 14, 34

Tex. Ins. Code § 544.054 ...............................................................9, 14, 18, 30, 34, 47

Farmers Group, Inc. ("Farmers") files this Opposition to the Motion for Class Certification ("Motion") filed by Plaintiffs Charles Grigson, Lisa Hoing and David Kelly ("Plaintiffs") and respectfully requests that the Court deny the Motion for the reasons set forth below.

## I.    <u>INTRODUCTION</u>

It was Plaintiffs' burden to establish in their Motion that the Rule 23 class certification requirements are satisfied.  They failed in numerous and dispositive ways to do so.  Plaintiffs have failed to show that common issues of fact or law will predominate in any trial in this action. They have failed to present a theory of damages that is correct under the case law or that can be applied on a class-wide basis using class-wide proof.  And they have failed to show that they are adequate class representatives, that their interests are aligned with the putative class, or that a class action is superior to individual lawsuits.

Instead, Plaintiffs' Motion focuses principally on merits issues and contains numerous inaccurate characterizations of exhibits and deposition testimony, bare allegations unsupported by evidence, and a detailed discussion of fact issues having no bearing on the class certification requirements.  By attempting to portray Farmers as a bad actor, Plaintiffs apparently hope the Court will require a less rigorous demonstration of the class certification requirements.  Farmers will not address herein all of these merits points or refute fact issues that will be before the Court, if at all, only if a class is certified.  Rather, Farmers will focus on the many reasons why Plaintiffs' case does not meet the requirements for class certification under a rigorous analysis.

Plaintiffs allege that all FA2 policyholders were uniformly discriminated against because they were precluded from accessing the FSPA policy and thus are owed the difference between the FA2 premium they paid and the FSPA premium they would have paid.  This is not a claim that can be established for every FA2 policyholder through common proof.  <u>First</u>, there is no evidence of universal preclusion because tens of thousands of FA2 policyholders, including two

of the three proposed class plaintiffs, actually switched to FSPA. Second, the evidence is undisputed that over one-third of the proposed class (over 200,000 FA2 policyholders) would have paid more for an FSPA policy at launch, meaning they cannot present even a colorable claim for damages and lack standing under the unfair discrimination statute. Third, whether actions by Farmers caused any given FA2 policyholder harm depends on, at the very least, (1) how the policyholder's Agent handled rewrites; (2) whether the policyholder was offered a rewrite and declined it; and (3) whether the policyholder would have switched to FSPA in light of the meaningful differences between the policies. Fourth, individual proof is needed not only to calculate FSPA premiums for FA2 policyholders who did not switch, but to determine whether each policyholder has actually suffered economic harm from not switching to FSPA. Fifth, Plaintiffs propose a damages model that applies the wrong legal standard, cannot calculate the purported damages on a class-wide basis with any reasonable degree of accuracy, and is actuarially unsound.

Because of the numerous individual and uncommon issues that predominate in determining whether Farmers is liable as to any given class member, Plaintiffs' claim is not subject to class-wide determination. Accordingly, Farmers respectfully requests that Plaintiffs' Motion be denied.

## II. **BRIEF FACTUAL BACKGROUND**[1]

The following is a discussion of facts bearing on Plaintiffs' failure to satisfy the certification requirements of Rules 23(a) and (b)(3).

---

[1] All citations to "Compl. ¶ __" are to Plaintiffs' First Amended Class Action Complaint (ECF No. 101) (the "Complaint") and to "Orig. Compl. ¶ __" are to the Class Action Complaint (ECF No. 1) filed on October 23, 2018 and February 8, 2017, respectively. All citations to "Ex. __" are to the consecutively-numbered exhibits to the Appendix of Exhibits filed contemporaneously with this Opposition. A brief glossary of key terms and abbreviations used in this Opposition is included as Ex. 46.

## A.    The FA2 and FSPA Auto Insurance Policies

Plaintiffs did not sue their insurer, Farmers Texas County Mutual Insurance Company ("Farmers Texas"). Instead, they sued Farmers, a Nevada company that provides various insurance-related services to Farmers Texas and other insurers across the country.[2]

In 2010, Farmers updated the Texas auto policy and created a new rating plan called Farmers Auto 2.0 ("FA2") for use by Farmers Texas.[3] The FA2 policy is based on a form promulgated by the Texas Department of Insurance ("TDI").[4] The FA2 rates were filed in February 2010, and TDI reviewed and allowed them.[5] The FA2 policy was launched in Texas by non-renewing existing auto policies and offering customers an FA2 policy priced under the new rating plan.[6] In the insurance industry, this is known as a "book roll."[7]

Book rolls can be very disruptive for an insurance company, its agents, and its policyholders, and the FA2 book roll was no exception.[8] Policyholder premiums are calculated under a new rating plan that takes into account different risk factors, resulting in rates that can be very different from the ones policyholders were paying under the old rating plan.[9] Policyholders

---

[2] Ex. 32, Declaration of Doi Tran ("Tran Decl.") ¶ 2. Unless noted otherwise, and for ease of reading, references to actions taken by Farmers will include any action performed by Farmers employees, even if performed on behalf of or in the name of Farmers Texas (such as regulatory filings).

[3] Ex. 31, Declaration of Staci D. Lee ("Lee Decl.") ¶ 4.

[4] *Id.*

[5] *Id.* ¶ 5.

[6] *Id.* ¶ 8.

[7] Ex. 27, Expert Report of Paul Braithwaite ("Braithwaite Report") ¶¶ 34–37. The report is attached to the Declaration of Paul Braithwaite in Exhibit 27. *See also* Ex. 32, Tran Decl. ¶ 5; Ex. 31, Lee Decl. ¶ 8.

[8] Ex. 27, Braithwaite Report ¶¶ 34–37; Ex. 32, Tran Decl. ¶¶ 5–6; Ex. 31, Lee Decl. ¶ 8; Ex. 33, Declaration of Alton Martin ("Martin Decl.") ¶ 4.

[9] Ex. 27, Braithwaite Report ¶¶ 34–36; Ex. 32, Tran Decl. ¶ 5; *see also* Ex. 29, Declaration of K. Helen Tai ("Tai Decl.") ¶¶ 6–11.

whose rates increase often do not understand the reason why, resulting in complaints to the insurer, agents, and even insurance regulators; even policyholders whose rates decrease make inquiries, including questioning whether they had been overcharged previously.[10]  Agents end up spending much of their time focused on existing policyholder issues after a book roll, with some existing customers inevitably leaving the company.[11]  Farmers Texas experienced this disruption after the FA2 book roll, with some of its agents referring to it as a "disaster."[12]

In 2013, Farmers began developing a new auto policy called Farmers Smart Plan Auto or "FSPA."[13]  FSPA is the first custom auto policy ever created by Farmers to be sold in Texas, and it took a large, multi-disciplinary team approximately two years to develop it.[14]  Farmers similarly started developing a new rating plan that would take into account new rating factors and new information not considered by the FA2 rating plan.[15]  Accordingly, Farmers began considering ways that the FSPA policy and rating plan could be introduced in Texas without the customer disruption that had been experienced in 2010 with the FA2 book roll.

An alternative to compelling all existing customers to purchase the new policy and pay premiums calculated under the new rating plan through a book roll is to introduce it using an "open/closed" rollout.  This type of rollout allows a company simultaneously to start selling the new policy with the new rating plan (the "open" book) while existing customers continue to

---

[10] Ex. 32, Tran Decl. ¶ 5; Ex. 27, Braithwaite Report ¶¶ 35–36; Ex. 33, Martin Decl. ¶ 4.

[11] Ex. 32, Tran Decl. ¶¶ 5–6; Ex. 27, Braithwaite Report ¶ 36; Ex. 33, Martin Decl. ¶ 4.

[12] Ex. 36, Declaration of Michael Engelbaum ("Engelbaum Decl.") ¶ 9; Ex. 32, Tran Decl. ¶ 6; Ex. 31, Lee Decl. ¶ 8.

[13] Ex. 31, Lee Decl. ¶ 9.  Internally, Farmers initially called the project Farmers Auto 3.0 or "FA3."  *Id.*

[14] *Id.* ¶¶ 10–11.

[15] Ex. 29, Tai Decl. ¶¶ 4, 7, 9–10, 12.

renew their existing policies under the existing rating plan (the "closed" or "renewal" book).[16] An "open/closed" rollout is a common and accepted practice in the insurance industry, and it avoids the disruption that occurs from forcing everyone into a new policy and rating plan.[17] Rate stability—meaning less significant, more predictable changes in rates over time—benefits policyholders in both the open and closed books and is encouraged by regulators like TDI.[18] Accordingly, Farmers began investigating the possibility of introducing FSPA on an open/closed basis in Texas.

**B.** **TDI Approves an Open/Closed Rollout of the FSPA Policy With Different Rates**

In late 2014, Farmers met with TDI representatives to discuss its planned rollout of FSPA on an open/closed basis.[19] TDI representatives explained that if the policies were the same, it could give rise to unfair discrimination concerns since each would be rated under different rating plans that would likely produce different premium amounts for similar policyholders.[20] Accordingly, TDI asked Farmers to provide a chart comparing the terms of coverage offered under the existing FA2 policy and the proposed FSPA policy.[21] In January 2015, Farmers

---

[16] Ex. 27, Braithwaite Report ¶¶ 34, 37–38; Ex. 32, Tran Decl. ¶ 4.

[17] Ex. 27, Braithwaite Report ¶¶ 34–41; Ex. 32, Tran Decl. ¶¶ 4–7.

[18] Ex. 27, Braithwaite Report ¶¶ 37–40; Ex. 32, Tran Decl. ¶ 7.

[19] Ex. 32, Tran Decl. ¶ 8; Ex. 3. As previously explained in Farmers' briefs at the pleading stage, the Texas Insurance Code (the "Code") establishes a comprehensive regulatory scheme for the insurance business in Texas and charges TDI and the Commissioner of Insurance with ensuring that consumers are treated fairly. The Code also prohibits insurers from using a policy form until it is reviewed and approved for compliance with all insurance laws and regulations, and also requires that all rates be filed and reviewed so the Commissioner can disapprove of any rates that it determines are excessive, inadequate, or unfairly discriminatory. *See* Motion to Dismiss, ECF No. 17, at 4–6.

[20] Ex. 32, Tran Decl. ¶ 8; Ex. 3.

[21] Ex. 32, Tran Decl. ¶¶ 8–9; Ex. 3.

complied with TDI's request, ultimately providing two versions of the chart.[22] As discussed below and reflected in the charts provided to TDI, the new FSPA policy reflects more than 140 differences from FA2.[23] Three examples of these differences include Auto Rewards (discussed in detail below) and changes to coverage for rental cars and accidents in Mexico.

After its review of the existing FA2 policy and proposed FSPA policy, TDI concluded they were not the same and were sufficiently different such that different rating plans charging different prices could be used for the two policies.[24] In reliance on that determination, Farmers Texas proceeded with FSPA policy and rate filings.[25] TDI then spent months reviewing the FSPA policy form and rating plan and sent Farmers more than 100 requests for information.[26] Consistent with its January 2015 determination that the FSPA and FA2 coverages were not the same, TDI ultimately approved the new FSPA policy form, allowed the new rating plan, and permitted an open/closed rollout.[27]

During its review in 2015, TDI asked Farmers to provide information about the average

---

[22] Ex. 32, Tran Decl. ¶¶ 9–10; Exs. 4 (first comparison chart) & 5 (second comparison chart). The charts provided by Farmers at TDI's request are exactly the same except for the added column identifying each coverage difference as neutral, restrictive, or expanded. Ex. 31, Lee Decl. ¶¶ 14–16.

[23] *See* Ex. 8; *see also* Exs. 4 & 5; Ex. 31, Lee Decl. ¶ 20. Among the key differences are new terms, conditions and limitations on coverages, definitions of previously undefined terms, new policyholder duties, different deductible and limit options, and the lack of certain policy benefits.

[24] *See* Ex. 32, Tran Decl. ¶ 11; Ex. 6. The fact that FA2 and FSPA policies provide different coverage is dispositive as to Plaintiffs' sole cause of action and is suitable for adjudication as a matter of law to the extent necessary if a class is certified. For certification purposes, Farmers will focus on some of the key differences between the two policies.

[25] Ex. 32, Tran Decl. ¶ 12; Exs. 13 & 14.

[26] Ex. 32, Tran Decl. ¶ 12; *see also* Ex. 31, Lee Decl. ¶¶ 17–19.

[27] Ex. 31, Lee Decl. ¶¶ 18–19; Ex. 32, Tran Decl. ¶ 12; Exs. 13 & 14. Because of changes requested by TDI, there are some differences between the FSPA policy language reflected in the comparison charts provided to TDI and the final language in the FSPA policy that went on sale in January 2016. Ex. 31, Lee Decl. ¶ 17.

rate level difference between FA2 and FSPA.[28]  In response to TDI's request, and because no

FSPA policyholders existed at the time, Farmers used data from a sample of FA2 policyholders

to calculate an estimate of the rate differential if one were to rerate the FA2 policies into FSPA

as new business.[29]  Because the FSPA rating plan considered information that had not been

collected from FA2 policyholders, numerous assumptions had to be made in order to perform the

requested analysis.  The results showed that, ***on average***, FSPA premiums would be less.[30]

However, as was the case with the FA2 book roll, FSPA premiums were estimated to be both

significantly more and significantly less for individual FA2 policyholders depending on their

specific rating characteristics (such as credit score, driving history, claims history, etc.).[31]

## C.    Farmers Texas Launches FSPA

Pursuant to TDI's determinations, Farmers Texas launched the new FSPA policy in

Texas on January 4, 2016.  Since 2016, FSPA has been sold in Texas through a network of more

than 3,000 insurance agents ("Agents") who were responsible for their own marketing.[32]  Agents

are independent contractors and independent business owners, and control their own

communications and interactions with customers.[33]  For example:

- Fort Worth Agent Russ Mitchell sent letters to customers when their policies were
  up for renewal inviting them to meet for a Farmers Friendly Review to discuss
  their policies and coverages.  His staff would send 10–15 emails each week
  encouraging customers to meet with him.  He wanted to discuss coverage options

---

[28] Ex. 29, Tai Decl. ¶ 23.

[29] *See* Ex. 29, Tai Decl. ¶¶ 18, 23–25; *see also* Ex. 27, Braithwaite Report ¶¶ 43–46.

[30] *See* Ex. 29, Tai Decl. ¶¶ 11, 13, 18, 20, 23–24, 29 and Ex. C (Response 5).

[31] *See* Ex. 29, Tai Decl. ¶¶ 12, 30.

[32] Ex. 30, Declaration of Narciso Sandico ("Sandico Decl.") ¶ 7 (more than 2,000 Agents as of
January 2016 and January 2018); *id.* ¶ 8 (approximately 3,700 total current and former Agents
from January 2016 to November 16, 2018); Ex. 32, Tran Decl. ¶ 14; Ex. 23 (Swope Dep. 26:21–
29:23, 57:18–58:5, 109:8–9, 211:1–11).

[33] Ex. 32, Tran Decl. ¶ 14; Ex. 22 (Mak Dep. 219:2–220:5).

with his customers, spent a lot of money on marketing, and another agent claimed Mitchell "spoiled" his customers given the regularity with his outreach efforts.[34]

- Houston Agents Ronald Myers and Henry Dao and El Paso Agent Michael Engelbaum use a postcard program that sends postcards to customers suggesting they contact them to discuss their policies and coverage needs. They each determine when to talk to customers about policy options and what to say.[35]

- El Paso Agent Yvonne Ruiz contacts her customers by e-mail and phone as part of her regular outreach efforts. She prefers to focus on customers who are going to experience a significant premium increase at renewal. She has "complete autonomy" in her customer discussions.[36]

- Port Neches Agent Alton Martin primarily responds to customer inquiries regarding coverage or policy options.[37]

As part of the overall strategy to provide rate stability in both books and to avoid policyholder disruption, Farmers asked Agents to moderate the rewrites they did from FA2 to FSPA.[38] However, Farmers did not prohibit rewrites, and in fact created a simple process for Agents to do them.[39] In addition, Farmers asked Agents to review the differences between FA2 and FSPA with anyone who wanted to rewrite and to obtain a signed Cancellation and Rewrite Agreement ("Rewrite Agreement") acknowledging that certain benefits would not be available and that differences in coverage exist under FSPA.[40]

---

[34] Ex. 34, Declaration of Russell Mitchell ("Mitchell Decl.") ¶ 8.

[35] Ex. 37, Declaration of Ronald Myers ("Myers Decl.") ¶¶ 5, 8; Ex. 38, Declaration of Henry Dao ("Dao Decl.") ¶¶ 5, 9; Ex. 36, Engelbaum Decl. ¶ 8.

[36] Ex. 35, Declaration of Yvonne Ruiz ("Ruiz Decl.") ¶¶ 6, 7.

[37] Ex, 33, Martin Decl. ¶¶ 5, 7.

[38] Ex. 32, Tran Decl. ¶ 16. For a discussion of why rewrites can cause rate disruption and rate need in both the open and closed books, see Ex. 27, Braithwaite Report ¶¶ 34–41; Ex. 32, Tran Decl. ¶ 7; Plaintiffs' Ex. 36 at FGI00136684 (Cripe memo).

[39] Ex. 32, Tran Decl. ¶¶ 16–17; Ex. 22 (Mak Dep. 92:14–92:23) ("Any customer that wanted to rewrite from Farmers Auto 2 to SPA was always allowed to rewrite into the new product, if they so chose to."); Ex. 23 (Swope Dep. 42:5–42:10, 113:11–113:17, 123:13–123:21, 188:7–189:2, 248:7–248:16) ("On the agent dashboard, there is a rewrite button that the agent can push and there's a set of guidelines that they can use in order to rewrite the product.").

[40] Ex 32, Tran Decl. ¶ 17. A copy of the agreement is attached as Exhibit 65 to Plaintiffs' Motion.

Between January 2016 and December 2018, about 50% of FA2 policyholders did not renew their FA2 policies, leaving just over 360,000 policyholders in the FA2 book.[41] During that same period, ***more than 44,000 FA2 policyholders were rewritten to FSPA by their Agents***.[42] Policyholders began rewriting from the very first day FSPA was offered, and an average of more than 1,200 policyholders have rewritten per month during the three years since launch.[43] Three of the policyholders who rewrote to FSPA are current or former Plaintiffs in this lawsuit.

### D. <u>Plaintiffs, Their Sole Cause of Action, and The Putative Class Definition</u>

Plaintiffs Charles Grigson ("Grigson"), Lisa Hoing ("Hoing"), and David Kelly ("Kelly") are Texas residents who have auto insurance policies issued by Farmers Texas.[44] When FSPA launched on January 4, 2016, all three of them had FA2 policies. Both Grigson and Kelly (and former Plaintiff Vale) later purchased FSPA policies, but Hoing has chosen not to do so.[45]

Plaintiffs' sole cause of action is for unfair discrimination under Section 544.052 of the Code.[46] The statute prohibits "unfair discrimination between individuals of the same class and of essentially the same hazard" in the amount of premiums, fees, or rates charged for an insurance policy, and renders actionable such discrimination if it causes "economic damages." Tex. Ins. Code §§ 544.052, 544.054(a). Plaintiffs claim Farmers unfairly discriminates against FA2 policyholders by offering new business FSPA customers "the same or virtually the same

---

[41] *See* Ex. 30, Sandico Decl. ¶¶ 3–4.

[42] *Id.* ¶ 6.

[43] *See id.*

[44] Compl. ¶¶ 12–15. Robert Vale ("Vale") filed suit initially but withdrew his claims when Hoing and Kelly were added as named plaintiffs. *Compare* Orig. Compl. at 1, *with* Compl. at 1.

[45] *See* Compl. ¶¶ 80, 83, 99; Ex. 26 (Grigson Dep. 81:11–82:6, 96:5–18); Ex. 25 (Kelly Dep. 51:5–17); Ex. 24 (Hoing Dep. 73:14–21, 111:1–10, 115:12–18, 117:8–14, 128:16–24).

[46] Compl. ¶¶ 111–123.

coverage" as FA2 for "generally lower premium rates."[47]  They allege Farmers perpetuates this

"scheme" by "walling off" FA2 policyholders from FSPA, hiding the existence of FSPA from

them, and imposing barriers to rewrites, resulting in FA2 policyholders paying "generally higher

rates."[48]  In short, the alleged act of discrimination is denial of "access" to the potentially cheaper

FSPA policy.[49]

Plaintiffs' claim is novel.  No litigant has ever asserted a discrimination claim under the

statute for being denied access to a policy he claims is essentially the same as the one he bought

but was separately approved by the insurance regulator with different rates.  Under this Court's

construction of the statute, Plaintiffs state a claim only if FA2 and FSPA are the same, since it is

not unfairly discriminatory to charge different rates for different policies:

> [Section 544.052] prohibits discrimination in any manner between individuals of the same class and essentially the same hazard for the same coverage.  ***Thus, so long as two policies offer the same coverage***, the fact that an insurer has created two or more policies does not preclude application of the statute. [. . .]
>
> Plaintiffs have sufficiently ***alleged that the two policies offer the same coverage***, but that the lower-priced rate is ***solely*** offered to new customers.  ***If true***, this is sufficient to support Plaintiffs' claims for relief."[50]

Plaintiffs allege they and all other putative class members have sustained damages equal

to the amount they paid for their FA2 policies less the amount they would have paid for FSPA if

they had been rewritten into FSPA on or after January 4, 2016.[51]

---

[47] *See id.* ¶¶ 1–2.

[48] *See id.* ¶¶ 2–4.

[49] The word "access" appears only once in the Complaint, but Plaintiffs went to great lengths to cast their claims as being about accessing the FSPA policy in order to survive dismissal under the filed rate doctrine at the pleadings stage.  *See* Plaintiffs' Omnibus Opposition to Defendant's Motion to Dismiss and Motion to Stay, ECF No. 29, at 1–4, 15, 19, 21, 23, 24.

[50] Report and Recommendation (the "Report"), ECF No. 48 at 6, 7–8 (emphasis added); *see also* Order, ECF No. 54, at 7 (adopting the Report and clarifying that Plaintiffs "challenge[] Farmers' *internal* policy of precluding policyholders [from] **the same or materially the same coverages**— a harm, ***if true***, that would violate section 544.052" (second emphasis added)).

Plaintiffs seek certification of the following class: "all Farmers Texas auto policyholders who had an active FA2 policy in effect on or after January 4, 2016."[52]  In other words, Plaintiffs ask this Court to certify a class comprising ***every single person*** who owned an FA2 policy as of January 4, 2016, ***regardless of whether*** he or she experienced any "barrier" to rewriting, was offered an FSPA policy by an Agent and decided not to rewrite, would have declined a rewrite if offered an FSPA policy, or is economically better off today due to keeping his or her FA2 policy.

### III.　　ARGUMENT AND AUTHORITIES

**A.　　Legal Standard for Class Certification**

Class certification is proper only "if the trial court is satisfied, after a rigorous analysis," that all of the Rule 23 prerequisites have been satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks and citation omitted).  This is because class actions are "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).

The four basic requirements for certification are commonality, numerosity, typicality, and adequacy.  Fed. R. Civ. P 23(a); *Dukes*, 564 U.S. at 349.  In addition to the Rule 23(a) factors, a party seeking certification "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast*, 569 U.S. at 33.  Plaintiffs move for certification exclusively under Rule 23(b)(3), which is "designed for situations in which class-action treatment is not as clearly called for."  *Id.* at 34 (internal quotation marks and citations omitted).  Certification under this rule is proper only if Plaintiffs show "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is

---

[51] *See* Compl. ¶¶ 8, 63, 118.

[52] Plaintiffs' Motion ("Mot."), ECF No. 118, at 38.

superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).

As the party seeking class certification, Plaintiffs bear the burden to "actually *prove*—not simply plead—that [the] proposed class satisfies each requirement of Rule 23, including . . . the predominance requirement of Rule 23(b)(3)." *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (courts are required to "find, not merely assume, the facts favoring class certification") (internal quotation marks and citation omitted).[53] In determining whether Plaintiffs have met their burden to show that this case can be tried on a representative basis, "the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" and class certification may not deprive defendants of their right to litigate defenses to individual claims. *See Dukes*, 564 U.S. at 367.

Here, Plaintiffs cannot establish that common questions, answerable by common proof, will predominate because the elements of their unfair discrimination claim, defenses to that claim, and damages calculations are not susceptible to class-wide resolution. For similar reasons, Plaintiffs have failed to satisfy the other Rule 23 requirements.

**B.** **The Putative Class Cannot Be Certified Because Plaintiffs Have Not Met Their Burden to Show Predominance**

The Court should deny the Motion because Plaintiffs have not met their burden to prove Rule 23(b)(3) predominance. If the putative class is certified and Plaintiffs' claim proceeds to

---

[53] Courts need not accept allegations in a complaint as true, and defendants bear no burden to *disprove* entitlement to class certification. *See, e.g.*, *Seeligson v. Devon Energy Prod. Co., L.P.*, 753 F. App'x 225, 230 (5th Cir. 2018); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 312 (5th Cir. 2005).

trial, then core liability and damages issues cannot be answered without individualized proof, and the case will devolve into a series of mini-trials.

### 1. Legal Standard for Predominance

Predominance requires a plaintiff to establish that common questions, answerable by common proof, predominate over questions affecting only individual members, answerable by individual proof. *See generally Tyson Foods, Inc. v. Bouaphakeo* , 136 S. Ct. 1036, 1045 (2016) (explaining that an individual question is one where "'members of a proposed class will need to present evidence that varies from member to member'"). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (citation omitted). Predominance is a "demanding" standard. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). It requires courts to consider "how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003), *cert. denied*, 540 U.S. 819 (2003). Thus, it "begins . . . with the elements of the underlying cause of action." *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348 (5th Cir. 2012) (internal quotation marks and citation omitted). Courts must identify the outcome determinative issues, assess which ones will predominate, and then determine whether they are common to the class, "'a process that ultimately prevents the class from degenerating into a series of individual trials.'" *Seeligson*, 753 F. App'x at 235 (citations omitted).[54]

---

[54] This must be evaluated by "'weighing, not counting, issues.'" *Seeligson*, 753 F. App'x at 234 n.48 (quoting *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F.Supp.2d 891, 912 (E.D. La. 2012), *aff'd sub nom.*, 739 F.3d 790 (5th Cir. 2014)); *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (predominance is not "determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance").

As noted above, Plaintiffs' theory of liability is novel, and there are no reported cases applying the statutory cause of action in the manner Plaintiffs ask the Court to do here. As this and other courts have recognized, reliance on a novel theory demands particularly careful and searching scrutiny of the Rule 23 requirements. *See, e.g.*, *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 749 (5th Cir. 1996); *Brown v. Mid-Am. Apartments, LP*, 327 F.R.D. 145, 153 (W.D. Tex. 2018) (acknowledging that legal or factual complexity concerns arising out of novel or untested theories can render it difficult for a court accurately to predict how a trial would be managed); *Neely v. Ethicon, Inc.*, No. 1:00-CV-00569, 2001 WL 1090204, at *13 (E.D. Tex. Aug. 15, 2001) (emphasizing difficulty of evaluating predominance in the context of a "new cause of action, an old cause of action applied to a new situation") (internal quotation marks and citation omitted).

### 2. Plaintiffs' Liability Theory Cannot be Adjudicated on a Class-Wide Basis

If the putative class is certified, Plaintiffs will have to prove at trial (among other things) discriminatory conduct, causation, and economic damages with respect to each and every class member. *See* Tex. Ins. Code §§ 544.052, 544.054(a). These outcome-determinative issues cannot be adjudicated on a class-wide basis because they require individualized inquiries.

#### (a) The Alleged Discriminatory Conduct Cannot be Proven on a Class-Wide Basis

Plaintiffs characterize the actionable discriminatory conduct as follows: "precluding existing FA2 policyholders from FSPA," "concealing" or "hiding" FSPA from them, keeping them "in the dark," and denying them "access" to FSPA's allegedly lower rates.[55] They claim this amorphous "conduct" applied "categorically" to the entire putative class.[56] However, Plaintiffs' allegations cannot be determined for the entire class through common proof. Sales of

---

[55] *See* Compl. ¶¶ 36, 45, 52, 85; Mot. at 1–3, 6–8, 24, 28–29. Plaintiffs use terms like "conceal," "hide," or "keep in the dark" to describe Farmers' conduct vis-à-vis FSPA more than a dozen times in their Complaint. *See, e.g.*, Compl. ¶¶ 3, 4, 36, 55, 68.

[56] Compl. ¶ 36; Mot. at 1.

FSPA policies occurred through an agency force made up of independent contractors, meaning determining whether FSPA was **actually** concealed from any given FA2 policyholder (or whether any policyholder was **actually** denied access to FSPA) necessarily calls for individual proof such as policyholder and Agent communications.

When sales occur through an independent agency force that was not provided a sales script when working with customers, certification is improper because any alleged misconduct cannot be uniformly established as to all purchasers. *See, e.g.*, *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010) (affirming denial of certification of claims concerning interest-crediting policies sold through thousands of independent agents). Non-scripted and non-standardized presentations require individualized evidence of how agents handled a particular customer's transaction. *See, e.g.*, *id.*; *In re LifeUSA Holding Inc.*, 242 F.3d 136, 145–47 (3d Cir. 2001) (no commonality or predominance where plaintiffs' claims of deceptive insurance sales practices arose from non-scripted and non-uniform presentations by thousands of agents). Where there is no script, sales by agents lead to "great variance in the representations" made to individual customers. *See, e.g., In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. 217, 221–23 (W.D. Mich. 1998) (individual issues predominated where "[defendant] did not generally communicate directly with prospective consumers or policyholders," but rather "[c]ommunications were made primarily by independent insurance brokers").

Likewise here, the FSPA policies were sold by more than 3,000 Agents during the proposed class period. Farmers provided no script or uniform direction to Agents regarding what to say about FSPA, rewriting, or how to raise FSPA with FA2 customers.[57] Far from instructing

---

[57] Ex. 32, Tran Decl. ¶ 15; Ex. 36, Engelbaum Decl. ¶ 8; Ex. 34, Mitchell Decl. ¶ 8; Ex. 23 (Swope Dep. 58:2–4, 59:23–60:18, 108:1–11, 211:20–212:12); Ex. 21 (Tran Dep. 71:15–20); *see also supra* pages 7–8.

that rewrites were prohibited, the FSPA Agency Guide provided to Agents details the rewrite process and how to do them.[58] This guide and other Agent materials contemplated that Agents would have individual discussions with FA2 customers regarding FSPA.[59] Also, Farmers Texas policyholders—including each of the named Plaintiffs—were encouraged through their renewal notices (and depending on their Agent in other communications) to attend meetings with their Agents called Farmers Friendly Reviews to discuss potential "coverage options" and "other product offerings that may be available."[60]

Not surprisingly given these facts, Agents had varied approaches on how, when and where they marketed the FSPA policy and the timing and content of their communications with existing customers. And evidence shows that some Agents freely discussed FSPA and rewrote customers as they saw fit. As six Agents across Texas explain:

- "I have never been pressured by anyone to stop, slow down, or reduce rewrites. . . My staff and I have complete autonomy to offer rewrite quotes to customers, and to bind FSPA policies for them should they desire to purchase them."[61]

- "To the best of my knowledge, every time I had [a Farmers Friendly Review] with an FA2 policyholder after FSPA launched I ran an FSPA quote to see if there would be premium savings under that policy. It is literally the first button I push. . . . Nobody ever talked to me about my rewrites being too high or instructed me

---

[58] Ex. 32, Tran Decl. ¶ 16; Ex. 23 (Swope Dep. 310:8–312:8); Ex. 43 (Swope Dep. Ex. 78 at FGI00024652–FGI00024654).

[59] Ex. 32, Tran Decl. ¶ 17; Ex. 43 (Swope Dep. Ex. 78 at FGI00024647, FGI00024648, FGI00024652); *see also* Ex. 21 (Tran Dep. 178:3–179:24).

[60] Plaintiffs' Ex. 66 (Grigson Renewal Offer) at PLTF00000051 and PLTF00000055; Plaintiffs' Ex. 69 (Hoing Renewal Offer) at PLTF00000328; Plaintiffs' Ex. 71 (Kelly Renewal Offer) at PLTF00000458 and PLTF00000463; *see also* Ex. 22 (Mak Dep. 143:14–144:7) (Farmers Friendly Reviews "[are] something that we've encouraged agents to do for -- ever since I've started with the company, again, to work with their customers. The agent is the best source of knowledge for the customer in terms of the products that we offer, the coverages, what's new out in the market.").

[61] Ex. 35, Ruiz Decl. ¶ 7.

to slow or stop rewriting. There were never any caps placed on the number of FA2 policyholders I rewrote."[62]

- "I certainly never concealed FSPA from any of my customers. I was never given any limit on the number of rewrites I could do. So I just ran with it, did what I could for my customers."[63]

- "Nobody ever gave me a specific number or percentage [of rewrites] that I was limited to. . . . The message I recall hearing was to be a smart business person and not to rewrite your whole book of business."[64]

- "We never concealed FSPA from any of our customers or changed our normal practice of quoting and offering FSPA where we thought it would help a customer. . . . We are independent contractors, and we presented to our customers about FSPA just as we would present any product."[65]

- "There were no limitations placed on my ability to rewrite my customers. I was able to rewrite customers as I saw fit based on my meetings with them and discussion of their needs."[66]

This Agent testimony is highly relevant as to whether the FA2 policyholders who had their policies with these agencies were unfairly discriminated against, yet Plaintiffs would have this Court rule that liability can be determined without this individualized proof.

Plaintiffs' own circumstances demonstrate that the purportedly common issue of whether Farmers engaged in discriminatory conduct is not ***in fact*** common, and there was no common course of conduct by Agents that precluded FA2 policyholders from learning about or accessing FSPA. Not only did three of the four people who seek (or sought) to represent the putative class rewrite through their Agents,[67] ***more than 44,000 FA2 policyholders likewise rewrote into***

---

[62] Ex. 37, Myers Decl. ¶¶ 6, 8.

[63] Ex. 33, Martin Decl. ¶ 6.

[64] Ex. 34, Mitchell Decl. ¶¶ 5, 7.

[65] Ex. 38, Dao Decl. ¶ 9.

[66] Ex. 36, Engelbaum Decl. ¶ 7.

[67] *See* Compl. ¶¶ 73, 80, 96, 99; Orig. Compl. ¶¶ 90, 92; *see also* Ex. 15 (Grigson and Vale's Interrogatory Responses) at No. 5, and Ex. 16 (Hoing and Kelly's Interrogatory Responses) at No. 5 (discussing Plaintiffs' communications with their agents).

**FSPA from January 2016 through December 2018 through their Agents.**[68]  This includes several thousand in the first few weeks after FSPA launched.[69]  Tens of thousands of rewrites is a far cry from Plaintiffs' allegations that only a "lucky few" have learned about FSPA and that there was a prohibition or cap on rewrites.[70]  Clearly, there was no common policy of preclusion.

Class issues do not predominate when, as here, "'transaction-by-transaction' determinations are required."  *See Ticknor v. Rouse's Enters., L.L.C.*, 592 F. App'x 276, 278 (5th Cir. 2014) (citation omitted).  The Court would have to "hear evidence regarding *each purported class member and his transaction*" to determine if he or she was "precluded" from or "denied access" to FSPA, and "[s]uch an individual examination would destroy any alleged predominance[.]"  *See Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 424 (5th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005).  Different Agents handled and communicated about rewrites differently, and common issues do not predominate.  *See, e.g.*, *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 883 (5th Cir. 1973) ("no common course of conduct" to sustain a Rule 23(b)(3) class where there was "no standardized communications" to putative class members).[71]

    (b)    *Causation is a Required Element of Plaintiffs' Claims and Cannot be Adjudicated Without Individualized Inquiry*

The Code provides a remedy for unfair discrimination only to those persons who have "sustained economic damages **as the result of** a violation of Section 544.052 . . . ."  Tex. Ins.

---

[68] Ex. 30, Sandico Decl. ¶ 6.

[69] *Id.* ¶ 6.  For context, as noted above, there were a total of approximately 730,000 FA2 policies in force in Texas in January 2016.  *Id.* ¶ 3.  From January 2016 through December 2018, the number of FA2 policies decreased to approximately 370,000.  *Id.* ¶ 4.

[70] *See* Compl. ¶ 55.

[71] *See also Avritt*, 615 F.3d at 1029 ("'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.'") (citation omitted).

Code § 544.054(a) (emphasis added). Thus, while Plaintiffs glaringly make no mention of causation in their Motion, it is clear their class claim will fail unless they show that Farmers' alleged discriminatory conduct uniformly caused economic harm.[72] Thus, for purposes of class certification under Rule 23(b)(3), the Court must analyze whether causation can be shown through class-wide proof and whether Farmers' causation defenses will raise individualized issues. *See Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 327, 329 (5th Cir. 2008).[73]

Here, Plaintiffs cannot establish through common proof that the alleged "concealment" or denial of "access" to FSPA uniformly caused harm to the putative class members. In particular, the discrimination alleged could not have caused harm if an FA2 policyholder (1) learned of FSPA and decided not to purchase the policy (whether due to price, coverage differences, or other considerations), or (2) would not have purchased the FSPA policy even if he or she had learned of it. The need for individualized fact-finding on these matters and the essential element of causation means common questions will not predominate at any trial.

### *(1)    Policyholders' Knowledge Regarding FSPA Is An Individualized Issue*

Plaintiffs cannot establish class-wide "concealment" or denial of access to FSPA because many FA2 policyholders actually knew about the product and either decided to rewrite or declined to do so. *See Sandwich Chef*, 319 F.3d at 220–21, 224 (class certification was improper

---

[72] The Motion only discusses Section 544.054 in the context of civil penalties, but the Complaint acknowledges the causation element. *See* Mot. at 24, 28, 36; Compl. ¶¶ 81, 89, 91, 100, 113.

[73] *See also Sandwich Chef*, 319 F.3d at 220, 224 (reversing class certification where the trial court "did not adequately account for individual issues of reliance that will be components of defendants' defense"); *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (establishing causation "is in no way lessened by reason of being raised in the context of a class action"); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008) (where injury and causation are elements of a claim, "to prevail in their argument for class certification, plaintiffs must establish that the issues of injury and causation do not defeat the predominance requirement of Rule 23(b)(3)"), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

where knowledge of inflated rates by policyholders would "break the chain of causation," was a component of defendants' defense, and necessitated individualized proof). The more than 44,000 FA2 policyholders who rewrote to FSPA certainly knew about FSPA. And there were Agents across Texas who offered rewrites and discussed the differences between the two policies without limitation.[74] As the Agents have testified, the FSPA policy was typically more expensive for FA2 policyholders and they declined to rewrite to FSPA for a number of reasons.[75] With respect to FA2 policyholders who were unaware of FSPA, what they would have learned about the policy depends on which of the more than 3,000 Texas Agents they had and what their Agent would have told them about it had they inquired (whether through a Farmers Friendly Review or otherwise).[76] Courts routinely deny certification on predominance grounds where a claim turns on what agents did or did not communicate to actual or prospective customers. *See Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 890 (5th Cir. 1987) (certification improper where "critical fact of nondisclosure was not common to the putative class").

(2)     *Whether Policyholders Would Have Switched Policies Is an Individualized Issue*

All four current and former Plaintiffs learned about the FSPA policy, but only three of them have chosen to rewrite.[77] But assuming some FA2 policyholders did not learn about FSPA, whether that caused them economic harm turns, in part, on whether they would have chosen to switch to FSPA. Indeed, if the alleged discriminatory conduct is the concealment and denial of

---

[74] *See, e.g.*, *supra*, footnotes 61-66.

[75] *See* Ex. 33, Martin Decl. ¶¶ 5, 7; Ex. 34, Mitchell Decl. ¶¶ 6, 9; Ex. 35, Ruiz Decl. ¶¶ 4–5; Ex. 36, Engelbaum Decl. ¶¶ 4–7; Ex. 37, Myers Decl. ¶¶ 6–7; Ex. 38, Dao Decl. ¶¶ 7–8.

[76] *See* pages 7–8 and 15–17, *supra*; Ex. 32, Tran Decl. ¶ 14; Ex. 21 (Tran Dep. 71:15–20; 178:3–179:24); Ex. 30, Sandico Decl. ¶ 8.

[77] *See* footnotes 45 and 67, *supra*; *see also* Ex. 24 (Hoing Dep. 94:3-21) (admitting she learned about FSPA in July 2018 but has not taken any steps to obtain a quote and still has no idea what her premiums would be in FSPA); *id.* (Hoing Dep. 51:21-52:5) (admitting she may not have chosen to rewrite even if she had specifically considered the issue).

access to FSPA, then that conduct only conceivably causes harm if an FA2 policyholder would have chosen to rewrite into FSPA if given the opportunity. *See In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 193 F.R.D. 505, 513 (W.D. Mich. 2000) ("In order for a misrepresentation or failure to disclose to be a producing cause of actual damages, the Texas courts have held there must ordinarily be some evidence of reliance on the misrepresentation, or inducement of action or inaction based on the misrepresentation.") (citing Fifth Circuit and Texas cases). This is precisely how Plaintiffs articulate causation in their Complaint.[78] As explained below, whether an FA2 policyholder would choose to switch is highly individualized and turns on each person's circumstances, motivations, and decision-making.

Plaintiffs' Motion asks this Court simply to assume causation by presuming that every FA2 policyholder is similarly situated and would have chosen to switch to FSPA if informed. Plaintiffs do not ground this proposed presumption in any legal authority or evidence. Rather, they ground it in an overly simplistic and misleading depiction of the facts, implying that no reasonable policyholder would have chosen to keep his or her FA2 policy after learning about FSPA because FSPA offers "identical or virtually identical coverage" at a lower price in "nearly all cases."[79] But we are past the pleading stage, and the evidence makes plain that (1) there are many reasons an insured would retain an FA2 policy after learning about FSPA, including price-driven reasons, and (2) there is a meaningful choice to be made between FA2 and FSPA policies.

As to whether there is an economic incentive to switch, approximately ***one third*** of the putative class would have paid ***higher*** premiums upon rewriting to FSPA if they had done so

---

[78] Compl. ¶ 89 ("Had Plaintiff Hoing been advised of FSPA and the corresponding lower FSPA rates, . . . Hoing would have switched to FSPA as of January 2016").

[79] *See* Compl. ¶¶ 1–2, 6, 33, 45, 89.

immediately after launch.[80] So Plaintiffs' proposed presumption—that every policyholder would have chosen to rewrite because they would have paid less for FSPA—lacks evidentiary support. And among FA2 policyholders who would have had lower premiums if they had rewritten, approximately 40% would have saved $20 or less per month.[81] In other words, the economic incentive for many putative class members to switch would have been small.

Notwithstanding Plaintiffs' contention that the FA2 and FSPA policies are the same, there are undeniable differences between them.[82] The coverage provided by insurance policies is, of course, an issue of law for this Court to determine. *See, e.g.*, *Tesoro Ref. & Mktg. Co., L.L.C. v. Nat'l Union Fire Ins. Co.*, 833 F.3d 470, 473–74 (5th Cir. 2016); *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). A rigorous analysis of whether Plaintiffs' claim may be certified "will frequently entail 'overlap with the merits of [their] underlying claim.'" *Comcast*, 569 U.S. at 33–34 (citation omitted). Accordingly, as part of its determination as to whether individual issues will predominate in this case, the Court must consider whether there are meaningful differences between the policies that could drive a consumer's preference for one over the other.

---

[80] *See* Ex. 29, Tai Decl. ¶¶ 26–28, 31. Neither Farmers nor Plaintiffs can do anything more than roughly estimate the rate differential between FA2 and FSPA (and thus the percentage of FA2 policyholders who would have paid more or less). The reason is because FA2 policyholders were not underwritten for the FSPA rating plan, meaning Farmers does not have the information needed to accurately calculate what their FSPA premiums would have been if they had switched. *See infra*, Section III(B)(3)(c).

[81] Ex. 29, Tai Decl. ¶ 31. Expressed as a percentage of their total FA2 premiums, more than 11% of the FA2 policyholders who would have paid less on rewrite would have saved 5% or less. *Id.*

[82] *See* Ex. 31, Lee Decl. ¶¶ 20–31; Ex. 32, Tran Decl. ¶¶ 9–11; Ex. 23 (Swope Dep. 99:23–100:6, 102:8–103:11, 139:10–140:6); Ex. 36, Engelbaum Decl. ¶¶ 4, 5; Ex. 35, Ruiz Decl. ¶ 5; Ex. 37, Myers Decl. ¶¶ 4, 7; Ex. 34, Mitchell Decl. ¶¶ 4, 6; Ex. 33, Martin Decl. ¶ 8; Ex. 38, Dao Decl. ¶¶ 4, 8.

For certification purposes, Farmers focuses on three differences between the policies that are meaningful to consumers. <u>First</u>, the FA2 policy has Auto Rewards, a set of three benefits FA2 policyholders automatically receive so long as they do not exceed a certain number of accidents or traffic tickets in any given period.[83] The Auto Rewards are Accident Forgiveness (a policyholder's first accident over a three-year period will not result in a rate increase), Incident Forgiveness (minor traffic violations will not result in a rate increase), and Guaranteed Renewal (filing one or more claims will not lead to cancellation or non-renewal of the policyholder's auto insurance).[84]

<u>Second</u>, the FA2 and FSPA policies differ in how they treat rental car damage. FA2 provides coverage for rental cars under the policy's liability section. This means rental car damage is repaired without payment of a deductible. Under FSPA, rental car coverage falls under the collision or comprehensive section of the policy, which requires payment of a deductible.[85]

<u>Third</u>, the extent and scope of coverage for accidents occurring in Mexico is different between the two policies ("Mexico Coverage"). FSPA, in part, broadened Mexico Coverage in that accidents may occur up to 50 miles across the border rather than 25 miles. But it also

---

[83] Ex. 31, Lee Decl. ¶¶ 21–28. As of January 2016 when the FSPA policy was launched, the majority of FA2 policyholders qualified for and thus had Auto Rewards. Ex. 30, Sandico Decl. ¶¶ 3–4. By December 2018, nearly all FA2 policyholders had them. *Id.*

[84] *See* Ex. 31, Lee Decl. ¶¶ 21–28.

[85] *Id.* ¶ 20. In FA2, all rented property is excluded from liability coverage, but is subject to an exception for "private passenger autos." *See* Ex. 1 at Part A, Exclusion 3.I and Exception 3.II.b (FGI00011463). In FSPA, the exceptions were removed from the liability coverage section. *See* Ex. 2 at Part I(D)(7) (FGI00011744). Instead, Part IV of the FSPA policy provides collision coverage for "your insured car," which the policy defines to include a rental car. *Id.* at Part IV.A.2. ("Damage to Your Car"); p. 4, Definition 22 (FGI00011742). Claims under the collision coverage section are subject to "applicable deductibles." *Id.* at Part IV.A.1. and IV.A.2 (FGI00011755). Both Grigson and Kelly have $500 deductibles for collision claims. *See* Ex. 44 (Kelly Dep. Ex. 80 at FGI00244213); Ex. 45 (Grigson Dep. Ex. 98 at FGI00243877).

narrowed it, requiring policyholders to actually get their vehicle back to the United States in order to make a claim, and to pay the cost of doing so.[86]

As reflected by the sworn testimony of Farmers Agents across Texas, there are many reasons FA2 customers have provided when declining to rewrite, including these three differences. For example:

- Agents had FA2 customers decline to rewrite because they did not want to lose their Auto Rewards.[87]

- Agents had FA2 customers decline to rewrite because they did not want to either lose their rental car coverage or have to pay a deductible for rental car damage.[88]

- Agents had FA2 customers decline to rewrite because they did not want to take on the cost and burden of returning cars damaged in Mexico back to the U.S. in order to obtain coverage.[89]

- An Agent had an FA2 customer who was an attorney decline to rewrite because he believed that any new policy being offered by an insurance company would on the whole be less favorable.[90]

- Some FA2 customers simply did not want to change policies and did not provide a reason to their Agents.[91]

As this evidence reflects, consumers value certain coverages and benefits provided by FA2 but not FSPA. Some FA2 policyholders knew about FSPA yet preferred to keep their FA2 policies even with a higher premium due to these policy differences.[92] In other words, consumers had meaningful choices to make when contemplating a rewrite.

---

[86] *Id.*

[87] *See* Ex. 35, Ruiz Decl. ¶ 5; Ex. 38, Dao Decl. ¶ 8; Ex. 37, Myers Decl. ¶ 7; Ex., 36, Engelbaum Decl. ¶ 7.

[88] *See* Ex. 37, Myers Decl. ¶ 7; Ex. 38, Dao Decl. ¶ 8; Ex. 36, Engelbaum Decl. ¶¶ 5, 7.

[89] Ex. 36, Engelbaum Decl. ¶ 4.

[90] Ex. 37, Myers Decl. ¶ 7.

[91] *Id.*

[92] *See* footnote 75, *supra.*

While Agent testimony should be dispositive on the point, Farmers provides this Court with more. It also retained Baylor University Professor of Marketing James Roberts, Ph.D., to conduct a consumer survey on some of the differences being cited by Agents as important to their customers. Dr. Roberts has more than thirty years of experience studying consumer behavior. He has taught marketing, marketing research, advertising, and consumer behavior courses to thousands of graduate and undergraduate students. Dr. Roberts also has published approximately 100 academic journal articles and conference papers, and two books, in these areas. And he has conducted, designed, supervised and/or reported on results of hundreds of consumer studies.[93]

Dr. Roberts surveyed 1,400 consumers with demographics that approximated the profile of Texas FA2 policyholders.[94] He asked them dozens of questions, stratifying the sample to further test for price sensitivity as to certain policy differences. His survey findings reveal:

- Over 80% of Texas consumers place importance on Auto Rewards (accident forgiveness, incident forgiveness and guaranteed renewal).

- Over 24% of Texas consumers are willing to pay between 7% and 8% more *for each* of the Auto Rewards.

- 53% of Texas consumers are *unwilling to switch* to a new policy lacking the Auto Rewards even with premium savings of up to 40%.

- Over 78% of Texas consumers place importance on their auto policy covering damage to rental vehicles.

- Over 73% of Texas consumers place importance on their auto policy covering damage to rental vehicles *without payment of a deductible*.[95]

---

[93] *See* Ex. 28, Expert Report of James A. Roberts Ph.D. ("Roberts Report") ¶¶ 5–6. The report is attached as Exhibit 1 to the Declaration of James A. Roberts Ph.D. in Exhibit 28.

[94] *Id.* ¶¶ 20–21, 31.

[95] *Id.* ¶¶ 32–38, 44–45 and Ex. B at 15–30, 33, 35.

It is no wonder that Texas consumers value Auto Rewards as highly as they do. Auto Rewards can make a significant difference for FA2 policyholders, including with respect to their rates over time. For example, having accident forgiveness and guaranteed renewal can mean that even a major claim resulting from a serious accident where the insured was at fault would not result in a premium increase or cancellation of the policy at the next renewal.[96] Agent Myers in Houston has seen firsthand how claims activity results in premiums more quickly increasing for FSPA customers than FA2 customers.[97]

The value consumers place on the differences in the rental car coverage is likewise understandable. If someone only had liability coverage and switched from FA2 to FSPA, he or she would lose all rental car coverage. And for policyholders who have collision coverage, switching from FA2 to FSPA means they now have to pay a deductible if they have a rental car claim. For anyone who has ever stood at a rental car counter debating whether to purchase rental car coverage or decline it, it is understandable how this difference alone could be dispositive. Indeed, El Paso Agent Michael Engelbaum has chosen not to rewrite his personal FA2 policy to FSPA in large part because of this difference. In particular, he wanted liability coverage for loaner cars he gets from his auto dealership when he takes his car in for repairs.[98]

As these examples demonstrate, price alone does not determine whether someone will switch from FA2 to FSPA. As Dr. Roberts explains, and as case law supports,[99] there is no

---

[96] *See* Ex. 31, Lee Decl. ¶¶ 21, 23–24, 27–28.

[97] Ex. 37, Myers Decl. ¶ 9.

[98] Ex. 36, Engelbaum Decl. ¶ 5; *see also* Ex. 31, Lee Decl. ¶ 20.

[99] *See, e.g.*, *McLaughlin*, 522 F.3d at 225–26 (recognizing putative class members could have decided to purchase light cigarettes "for any number of reasons"); *Poulos v. Caesars World, Inc*., 379 F.3d 654, 665–66 (9th Cir. 2004) (recognizing people choose to gamble for many reasons, and that "one motivation does not 'fit all'"); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453–454 (S.D. Cal. 2014) (consumer survey demonstrated there were many reasons why consumers

monolithic consumer, and most consumers are motivated by more than price alone.[100]  Plaintiffs'

proposed coverage expert concedes that coverage differences matter in addition to price, having

written a paper on how coverage differences or "enhancements" allow insurance companies "to

sell a product over the perception that the lowest price means the best product," concluding that

such enhancements can influence a customer to choose one policy over another.[101]  He further

acknowledges that guaranteed renewal is one such coverage enhancement and that accident

forgiveness could also be one.[102]

     The survey results and Agent testimony provide strong proof that if any given agent

actually "concealed" FSPA from a customer, whether such action caused any harm whatsoever

requires individual proof.   There is no harm from concealing a policy a customer would not have

wanted, and there is no way to determine from common proof which coverage differences matter

to which FA2 policyholder.   For example, Auto Rewards are important to some customers, but

might not be important to a policyholder who cares only about paying the lowest price regardless

of the risk of a future higher one.   And rental car coverage differences clearly matter to some, but

may not matter to a policyholder who does not travel, carries comprehensive coverage, and does

not mind taking the risk of having to pay a deductible on a rental car claim.   While El Paso

Agents have customers whose proximity to Mexico makes the details of Mexico coverage very

---

purchased a particular line of cosmetics other than defendant's representation that they would
last a full 24 hours); *Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, 564–
65 (2011), *as modified* (Aug. 1, 2011), and *Fairbanks v. Farmers New World Life Ins. Co.*, No.
B257386, 2016 WL 7131603, at *4, 6 (Cal. Ct. App. Dec. 7, 2016) (recognizing there are many
factors that might make a universal life insurance policy attractive to a particular purchaser).

[100] *See* Ex. 28, Roberts Report ¶¶ 3, 14, 33, 34–49.

[101] Ex. 19 (Averill Dep. 149:13–16, 150:11–153:22, 155:23–158:19, 159:8–18, 177:23–178:17);
Ex. 42 (Averill Dep. Ex. 12).

[102] Ex. 19 (Averill Dep. 165:24–167:5, 168:21–169:22).

important to them, this coverage lacks importance to many others.[103]   And these are but a few examples of the more than 140 differences between the FA2 and FSPA policies,[104] differences that Plaintiffs would have this Court conclude have no meaning to any policyholder.

It is impossible to know what choice each policyholder would have made at any point in time without presenting all of the pertinent information to a factfinder.[105]   Indeed, Hoing has been a plaintiff in this case for half a year, learned of FSPA in July 2018, is represented by counsel, and still has not decided whether she wants to switch to FSPA.   When asked which choice she would make, she testified that it depends on which is in her "best interest" (an inquiry she appears to be intentionally avoiding).[106]

Plaintiffs cannot prove causation on a class-wide basis because they cannot show that all FA2 policyholders would have chosen to rewrite if given the choice.   *See, e.g.*, *Fairbanks*, 2016 WL 7131603, at *11–12 (differences in policyholder preferences and goals meant the trial court could not ignore individual differences in the effect of the alleged wrongful conduct and precluded class certification).   And they have cited no legal authority for the proposition that the Court simply can assume that anyone who would have paid less if they had rewritten into

---

[103]   This is confirmed by Dr. Roberts's survey, which found that nearly 73% of Texas consumers place no importance on Mexico coverage.   *See* Ex. 28, Roberts Report, Ex. B at 32.

[104]   *See* Ex. 31, Lee Decl. ¶ 20.   Plaintiffs' purported coverage expert opines that differences in seemingly minor coverages (e.g., trailer or pet coverage) are meaningful to some insureds but not others, and that "[i]t all depends on the situation." Ex. 19 (Averill Dep. 164:1–165:14).   Kelly also conceded at his deposition that some people regard pet coverage and Mexico coverage as important, even if he does not; while others could care about particular coverages afforded by FA2 but not FSPA.   Ex. 25 (Kelly Dep. 63:6–65:23, 89:7–91:6, 103:9–106:19).

[105]   Plaintiffs cannot obtain the FA2 coverages and benefits at FSPA rates, which would violate numerous legal principles of causation and damages and violate the filed rate doctrine.   *See infra*, Section III(B)(3)(b).

[106]   *See* Ex. 24 (Hoing Dep. 51:21–52:5, 60:8–13, 70:12–21, 84:14–85:8, 94:3–21, 128:7–12).

FSPA—even one dollar less—would have decided to do so.[107]   The Fifth Circuit, like other circuits, has repeatedly determined that class certification is improper where causation cannot be determined on a class-wide basis.   *See, e.g.*, *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 376, 379 (5th Cir. 2016) ("the district court did not abuse its discretion in concluding that individualized questions of causation would be the central, or predominant, issue when this case is tried" and in rejecting certification on that ground); *Sandwich Chef*, 319 F.3d at 220, 224 (reversing certification where causation could only be proven on an individual basis); *McLaughlin*, 522 F.3d at 226, 234 (predominance not satisfied where, among other things, "the issue of loss causation . . . cannot be resolved by way of generalized proof"); *Poulos*, 379 F.3d at 665 (affirming denial of certification where "individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis").

While causation is Plaintiffs' burden to carry, Farmers is entitled to defend itself against the charge of unfair discrimination by showing at trial that any alleged concealment or "barriers" caused a policyholder no harm because either he or she knew about FSPA and elected not to rewrite or would have kept his or her FA2 policy regardless.   *See Dukes*, 564 U.S. at 367 ("the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" and class certification may not deprive defendants of their right to litigate defenses to individual claims) (citations omitted); *Sandwich Chef*, 319 F.3d at 220–21, 224 (defendants were entitled to challenge causation proof with evidence regarding individual policyholders' knowledge).   But here, it is impossible to assess causation—to tell what effect, if any, the alleged

---

[107] Indeed, Grigson testified that he probably would not have switched to save only $1 and conceded it is "certainly possible" there are people who are not price sensitive and would not switch policies to save $20–$30.   *See* Ex. 26 (Grigson Dep. 230:11–231:7).

discrimination had on an FA2 policyholder—without an inquiry into each policyholder's individual circumstances.

Whether framed as an element of Plaintiffs' claim or a defense, causation will be a focal point of any trial and is an individualized issue that defeats predominance. *See Gene And Gene*, 541 F.3d at 327, 329 (whether regarded as an affirmative defense or an element of the claims, the issue of consent could not be "established via class-wide proof," defeating predominance); *Algarin*, 300 F.R.D. at 457, 459 (where expert evidence showed materiality and reliance varied among consumers because their knowledge and expectations regarding the defendant's products varied, these elements were not "subject to common proof" and predominance was not met).[108]

(c) *Economic Harm is a Required Element of Plaintiffs' Claims and Will Require Individualized Inquiry to Adjudicate*

Chapter 544 confers statutory standing only to persons who sustain economic damages as a result of alleged unfair discrimination. Tex. Ins. Code § 544.054(a). Thus, actual economic harm is a required element of Plaintiffs' sole cause of action that must be proven in order for Plaintiffs and the putative class members to prevail at trial if a class is certified. As noted above, Plaintiffs allege that FSPA was generally cheaper. However, Plaintiffs must prove that each FA2 policyholder who did not rewrite into FSPA would have been economically better off if he or she had done so. It is impossible for Plaintiffs to prove economic harm on a class-wide basis for at least three reasons.

---

[108] *See also Maxwell v. United Servs. Auto. Ass'n*, 342 P.3d 474, 480–83, 486 (Colo. App. 2014) (trial court did not abuse discretion in denying class certification where "'there [was] no uniform method to predict what class members would have done if there had been disclosure'" of withheld information regarding UM/UIM coverage, as the evidence indicated the decision to purchase this coverage for a particular class of insureds is "'based on a value judgment, which depends on individual values'").

First, the putative class contains many policyholders who have not sustained economic damages because their FA2 premiums were *lower* than their FSPA premiums would have been if they had rewritten at the first opportunity. Approximately 34% of the putative class would have paid more if they had rewritten into FSPA in January 2016.[109] And because FA2 and FSPA rates changed about every six months,[110] the amount of people who would pay more for FSPA likewise changed over time. Indeed, after the first FSPA rate change in July 2016, more than 52% of the putative class would have paid more if they had rewritten.[111] Plaintiffs *concede* there are putative class members who would not have been better off if the alleged discrimination had not occurred, but try to minimize the issue by casting such persons as the "minority."[112] This, of course, misses the point. What matters is not whether policyholders who would have paid more in FSPA constitute more or less than 50% of the putative class. What matters is the evidence makes plain Plaintiffs want this Court to certify a class containing numerous policyholders who admittedly sustained no economic damages and, therefore, cannot prove a required element of their claims even if Farmers engaged in all of the alleged discriminatory conduct.

Compounding this problem is the fact that even if someone would have paid less if rewritten in January 2016, that alone does *not* prove that he or she sustained economic damages as a result of the alleged discriminatory conduct. This is because FSPA rates have increased disproportionately to FA2 rates over time.[113] Thus, a policyholder who would have seen a small savings from rewriting in January 2016 might very well end up paying more under FSPA over

---

[109] Ex. 29, Tai Decl. ¶ 31.

[110] *Id.* ¶ 12; Ex. 32, Tran Decl. ¶ 18.

[111] Ex. 29, Tai Decl. ¶ 36.

[112] Mot. at 25 (citing no evidence).

[113] Ex. 29, Tai Decl. ¶ 31; Ex. 32, Tran Decl. ¶ 18.

time than if he or she had never rewritten. For example, it is estimated that six percent of FA2 policyholders (about 44,000 people) would have saved less than $20 per policy if they had switched at launch.[114] Then at their first renewal, they would have experienced a rate increase that was on average 4% higher than if they had stayed in FA2.[115]

That the putative class is substantially over-inclusive is apparently by design. Plaintiffs know if the class were limited to include only policyholders who would have benefitted by rewriting into FSPA, then the class could not be certified because it would not be ascertainable. To maintain a class action, "'the class sought to be represented must be adequately defined and clearly ascertainable.'" *Seeligson*, 753 F. App'x at 229 (citation omitted); *see also, e.g.*, *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015). By proposing a class definition that includes all FA2 policyholders in an attempt to sidestep this major issue, Plaintiffs simply substitute one certification-defeating problem (ascertainability) with another (predominance).

<u>Second</u>, determining whether a policyholder sustained economic damages as a result of the alleged discrimination also requires knowing the policyholder's claims history. Focusing solely on Auto Rewards, rental car coverage, and Mexico coverage, these differences alone demonstrate that the differences between FA2 and FSPA can impact claims outcomes (i.e., whether claims are covered and in what amounts) and premium calculations. The only way to know the effect of these differences, if any, on class members would be through individualized proof of claims histories since January 2016.[116] This would result in a series of mini-trials, defeating predominance. *See Gene And Gene*, 541 F.3d at 326; *Crutchfield*, 829 F.3d at 376.

---

[114] Ex. 29, Tai Decl. ¶ 31.

[115] *Id.* ¶ 35.

[116] There have been nearly a million auto claims made under FA2 and FSPA policies in Texas since FSPA's launch. *See* Ex. 39, Declaration of Sylvia Ting ¶ 2.

For example, consider a person who could have saved $100 by rewriting in January 2016 but caused an accident in April 2016 and was ticketed for a moving violation (e.g., speeding or failure to yield right of way) in September.  He may have saved $100 in the first policy period by switching to FSPA, but faced a large premium hike later in the year because he no longer had his FA2 Auto Rewards.  If he was still in FA2, on the other hand, he may have paid the extra $100 in premiums during the same period but one or both of the accident and ticket would have been forgiven.  Another example would be a person who would have saved $250 by rewriting but was involved in an accident a few months later while driving a rental car.  In FA2, the full cost of the repairs would be covered, but under FSPA the policyholder would have to pay a deductible.[117] In such a case, the policyholder's overall economic position would have been **_worse_** if he had chosen to rewrite.  Such a policyholder has not sustained economic harm as a result of any alleged discrimination.

The Motion is completely silent on this issue.  Nor do Plaintiffs cite any authority for the proposition that they can prove economic damages merely by showing a premium savings from a rewrite without any consideration of the additional cost that would have been incurred from the rewrite, such as differences in claims outcomes over time.  Equally important, Farmers cannot be stripped of the right to defend itself on this basis.  *See Dukes*, 564 U.S. at 367 ("a class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims"); *see also Johnson v. Kansas City S. Ry. Co.*, 208 F. App'x 292, 296–97 (5th Cir. 2006); *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 301 (5th Cir. 2004).

---

[117] *See id.* ¶ 20.  As noted above, Grigson and Kelly have $500 deductibles that would apply to rental car claims under FSPA.  *See* footnote 85, *supra*.

Third, putative class members who have not sustained economic damages as a result of the alleged discrimination lack statutory standing to assert a claim under Section 544.052. *See* Tex. Ins. Code §§ 544.052, 544.054(a). Plaintiffs try to brush this aside by arguing "[i]t is clear under Fifth Circuit precedent" that a class can be certified "notwithstanding the fact that it may contain some minority of class members who did not suffer economic damages."[118] They are wrong. The Fifth Circuit has not resolved the legal question of whether a class can be certified if it includes persons who lack standing, i.e., whether only named plaintiffs or every absent class member must have standing. *See In re Deepwater Horizon*, 785 F.3d 1003, 1018–19 (5th Cir. 2015).[119] Under the latter approach, the evidence that many putative class members would have paid *more* for FSPA had they rewritten in January 2016 is dispositive as to certification.[120]

In any event, economic damage is a required element of every single class member's claim under Section 544.052. *See* Tex. Ins. Code §544.054(a). Accordingly, if the putative class were certified, Farmers would be entitled to discovery and an opportunity to defend itself by

---

[118] Mot. at 25 (citing *In re Deepwater Horizon*, 739 F.3d 790, 812–13 (5th Cir. 2014) and *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009)).

[119] *See also, e.g.*, *Sistrunk v. TitleMax, Inc.*, No. SA14CA628RP(HJB), 2016 WL 9450445, at *6 n.3 (W.D. Tex. Aug. 26, 2016), *report and recommendation approved*, 2016 WL 9450689 (W.D. Tex. Nov. 16, 2016). The Fifth Circuit in *Deepwater Horizon* declined to decide the issue because it concluded the named plaintiffs *and* the absent class members included only those who could allege injury and causation. *See Deepwater Horizon*, 739 F.3d at 801–02; *see also Sistrunk*, 2016 WL 9450445, at *6 n.3 (same).

[120] *See* footnote 109, *supra*; *see also Deepwater Horizon*, 785 F.3d at 1019. For this reason, Plaintiffs' reliance on the *Kohen* case is particularly misplaced. *See* Mot. at 25 (citing *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009)). While the *Kohen* court acknowledged that the mere possibility that a class contains persons uninjured by the alleged conduct does not preclude certification, it also emphasized that "a class should not be certified if it is apparent that it contains a *great many persons who have suffered no injury* at the hands of the defendant," and that while some class members may not have been harmed, "there is no reason at this stage to believe that *many* were [not harmed]." *Id.* at 677–78 (emphasis added). That is not the case here, as the evidence shows many class members have not sustained any economic harm and therefore cannot maintain a claim under the statute.

litigating the issue. *See Dukes*, 564 U.S. at 367. This would entail individualized inquiry regarding all of the above issues—including whether a class member would have chosen to switch and how much they would have saved, if anything, on rewrite—in order to determine whether each class member has sustained economic harm. Adjudicating the foregoing would overwhelm the other issues of proof at trial, which defeats predominance. *See, e.g.*, *Seeligson*, 753 F. App'x at 235; *Crutchfield*, 829 F.3d at 376.

### 3. Plaintiffs' Theory and Model for Proving Damages Cannot be Adjudicated on a Class-Wide Basis

As with each element of Plaintiffs' claim, Rule 23(b)(3) demands scrutiny of all issues related to damages, including individualized issues. *See Crutchfield*, 829 F.3d at 378. Indeed, the Fifth Circuit "recognizes that individual damages issues can preclude class certification." *Ibe v. Jones*, 836 F.3d 516, 530 (5th Cir. 2016). The Fifth Circuit also has long held that "class treatment 'may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate.'" *Id.* at 529 (quoting *Bell Atlantic*, 339 F.3d at 307). Simply identifying a formula or model is far from sufficient. A class plaintiff's damages model must be consistent with and "must measure only those damages attributable" to the plaintiffs' theory of liability; otherwise, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. "[C]ourts must conduct a 'rigorous analysis' to determine whether that is so." *Id.*

As explained below, Plaintiffs propose a damages model that would allow each putative class member to recover the full difference between his or her premium based on FA2 rates versus "contemporaneous FSPA rates" for each policy period.[121] Their proposed model is

---

[121] Mot. at 31–32.

legally insufficient and does not satisfy the appropriate legal standard, fails to measure the damages attributable to their liability theory, and would require significant individualized discovery and proof. These deficiencies further warrant denial of the Motion.

*(a)* *Applicable Legal Standard for Rate "Discrimination" Damages*

While no case law exists on measuring damages under Section 544.052, federal and Texas state courts are not strangers to the issue of damages in rate discrimination cases. Beginning with the U.S. Supreme Court's seminal decision in *Interstate Commerce Commission v. U.S., ex rel. Campbell*, 289 U.S. 385 (1933) ("*Campbell*"), courts emphatically have rejected the "differential" damages methodology urged by Plaintiffs in this case.

*Campbell* involved claims by a lumber company regarding the rates being charged by rail carriers. 289 U.S. at 386. Like Plaintiffs in this case, the lumber company admitted the rates it was paying were reasonable. *Id.* at 386–87. But it alleged that certain rail carriers had given an "unlawful preference" to other lumber companies within the same territory. *Id.* The Interstate Commerce Commission found the rate difference to be unlawful, but nevertheless refused to award damages. *Id.* at 387–88. The Supreme Court upheld the ruling, explaining that "[w]hen discrimination and that alone is the gist of the offense, the difference between one rate and another is ***not*** the measure of the damages suffered" but constitutes only one "evidentiary circumstance to be viewed along with others[.]" *Id.* at 389–90 (emphasis added). In so holding, the Court distinguished between "overcharge" plaintiffs, who claim to have paid an "excessive or unreasonable" rate and can presumptively recover the rate differential, and "discrimination" plaintiffs, who paid a reasonable rate but complain that some other person paid less. *Id.* at 390. As the Supreme Court reasoned, holding "discrimination" plaintiffs to a higher standard of proof makes sense, because, unlike "overcharge" plaintiffs, discrimination plaintiffs undisputedly paid

a reasonable rate and would not necessarily have paid less absent the alleged discrimination; indeed, they could have paid the same rate regardless. *Id.* at 392.[122]

In short, under *Campbell*, a plaintiff who pays a reasonable rate does not suffer damages merely because another similarly situated person pays a lower one. Rather, courts must demand proof beyond a rate difference and cannot measure damages based solely on this differential. *Campbell* remains the gold standard for assessing damages in rate discrimination cases. State and federal courts in Texas, including the Texas Supreme Court, have adopted its reasoning and rejected damages models—like Plaintiffs'—that simply purport to measure a rate difference. *See United Gas Corp. v. Shepherd Laundries Co*., 189 S.W.2d 485, 488 (Tex. 1945) ("[R]espondent's suit is not for overcharge but for discrimination where . . . damages must be alleged and proved. However, respondent seems to ignore these fundamentals and bases its suit solely upon the theory that it should be entitled to recover simply because it paid a certain rate and others paid less."); *see also, e.g., Kousal v. Tex. Power & Light Co.*, 179 S.W.2d 283, 287 (Tex. 1944); *Collerain v. City of Granbury*, 760 S.W.2d 364, 366–67 (Tex. App.—Forth Worth 1988, no writ.). Because discrimination cases require individualized proof of damages beyond a mere rate difference, certification is not appropriate.

The *Campbell* approach comports with Texas' "but-for" standard of damages, which limits damages to those "necessary to put injured parties in the position they would have

---

[122] *See also Danna v. Air France*, 334 F. Supp. 52, 63 & n.42 (S.D.N.Y. 1971), *aff'd*, 463 F.2d 407 (2d Cir. 1972) ("The result should not be seen as unjust simply because it is held that the [plaintiffs] are without remedy anywhere. . . . [P]laintiffs paid a rate which they do not contend is in itself unreasonable. Their complaint is not that they paid too much but that others . . . paid too little. If the airlines had not filed the youth tariffs at all, the plaintiffs would have paid the same fare they actually did pay. . . . [*Campbell's*] logic . . . is even stronger in this [consumer] case.").

occupied ***but for*** the injury"—and not in a better position.[123]  *Norman v. League City Nat'l Bank*, No. 01-92-01112-CV, 1998 WL 135452, at *4 (Tex. App.—Houston [1st Dist.] Mar. 26, 1998, no pet.) (emphasis added); *see also Waldon v. Williams*, 760 S.W.2d 833, 834 (Tex. App.—Austin 1988, no writ.) ("A fundamental purpose of all rules of damages, other than punitive damages, is to indemnify an injured party for the pecuniary loss suffered, placing him as nearly as possible in the position he would have occupied but for the injury in question.").

> (b)    *Plaintiffs' Proposed Damages Model is Legally and Factually Deficient*

Plaintiffs' proposed damages model would measure the contemporaneous rate differential between FA2 and FSPA over time and nothing more.[124]  This is precisely the sort of "overcharge" damages model that has been repeatedly rejected by *Campbell* and its progeny in cases based on a "discrimination" theory of liability like this one.

Notably, Plaintiffs survived dismissal of their sole claim for unfair discrimination by representing to the Court that their claim concerned the preclusion of ***access to FSPA*** and did not challenge the reasonableness of the rates being charged for either policy.[125]  However, their class certification motion purports to calculate rate differentials between FA2 and FSPA over time ***and nothing more.***  This not only measures damages based on an inapplicable "overcharge" theory of liability, it violates the filed rate doctrine.

---

[123] In a diversity action, "state law governs what damages are available for a given claim and the manner in which those damages must be proved."  *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 398 (5th Cir. 2013).

[124] Mot. at 31–33.

[125] *See* Order, ECF No. 54, at 7; *see also* Ex. 17 (Grigson's RFA Responses) at RFA Nos. 2–5; Ex. 18 (Kelly and Hoing's RFA Responses) at RFA Nos. 2–5; Plaintiffs' Omnibus Opposition to Defendant's Motion to Dismiss and Motion to Stay, ECF No. 29, at 19 ("Plaintiffs' claim is not that the FA2 premium rates they were charged were unreasonable or "too high." Plaintiffs do not challenge the propriety of any rates filed with TDI . . . .").

The filed rate doctrine "'holds that any "filed rate"—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers.'" *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 508 (5th Cir. 2005), *cert. denied*, 546 U.S. 1091 (2006) (quoting *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)). "The Fifth Circuit has enunciated the doctrine in broad terms[.]" *Winn v. Alamo Title Ins. Co.*, No. A-09-CA-214-SS, 2009 WL 7099484, at *4 (W.D. Tex. May 13, 2009), *aff'd*, 372 Fed. App'x 461 (5th Cir. 2010), *cert. denied*, 562 U.S. 890 (2010). Allowing a court to "award damages to a customer based on a rate lower than the filed rate would undermine the regulatory scheme." *Sw. Bell Tel. Co. v. Metro-Link Telecom, Inc.*, 919 S.W.2d 687, 693 (Tex. App.—Houston [14th Dist.] 1996, writ denied). Here, Plaintiffs appear to seek for FA2 policyholders who have not rewritten damages that essentially refund them the difference between what they paid for FA2 and what they would have paid for FSPA. This is not providing "access" to FSPA. This is seeking *the FSPA rate* for FA2 policies. This Court should not certify a class seeking damages that are legally unrecoverable.

Plaintiffs' model also does not even attempt to measure the required "but-for" damages—i.e., the rates that would have been available to putative class members but for the alleged discrimination. Instead, Plaintiffs ask this Court to *presume* that were it not for the alleged discrimination, every single FA2 policyholder in the putative class would instead have paid "contemporaneous FSPA rates."[126] *Campbell* teaches that a plaintiff who paid a reasonable rate—here, the FA2 rate filed with and allowed by TDI—does not suffer damages simply because someone else may have paid a lower rate.

---

[126] Mot. at 31–32.

Not only is Plaintiffs' proposed damages model in conflict with the correct legal standard, it is contrary to the evidence. Plaintiffs presume that everyone who would have saved at least $1 would have chosen to rewrite into FSPA and would have done so during the first half of 2016. Putting aside whether that assumption is reasonable, even if it is true, then it means that every adjustment to the filed rate thereafter in both the open and closed books would have been made on very different facts.[127]

As explained by leading actuarial expert Paul Braithwaite, Plaintiffs' damages model is actuarially unsound because it does not take into account the impact of the majority of FA2 policyholders switching to FSPA in the first half of 2016 (the model's premise).[128] If in fact everyone who would have saved at least $1 had switched either on January 4, 2016, or at their first renewal, FSPA rates thereafter would have, by necessity, been higher than they were.[129] Plaintiffs attempt to obtain a premium differential they claim FA2 policyholders were denied **that would not have existed** had they switched.

Plaintiffs' damages expert, who is not an actuary and has no experience with creating or implementing rating plans,[130] tellingly has not even attempted to determine the FSPA rates that would have existed had the putative class of FA2 policyholders switched as Plaintiffs contend they would have done but for the alleged discrimination. FA2 policyholders cannot be placed in a better position than they would have been in had they all switched to FSPA. Yet that is exactly the damages model Plaintiffs have presented to this Court for the proposed class.

---

[127] *See* Ex. 27, Braithwaite Report ¶¶ 39–40, 114–18.

[128] *See id.* ¶¶ 114–18.

[129] *Id.*

[130] Ex. 41 (Fuller Dep. 17:17–20:16).

(c) *Even Under Plaintiffs' Flawed Damages Theory, the Alleged Unfair Discrimination Damages Cannot Accurately Be Calculated on a Class-Wide Basis*

Even setting aside ***all*** the above issues and assuming the appropriate measure of damages from the alleged discrimination is the difference between each policyholder's FA2 and FSPA premiums since January 2016, Plaintiffs' proposed methodology for quantifying such damages is unreliable: it cannot accurately calculate rate differentials for each putative class member, and extensive individualized discovery and proof would be required to adjudicate damages.[131]

In the first instance, Plaintiffs' conspicuous focus on the overall rate difference between FA2 and FSPA and the "average savings" they claim FA2 policyholders would have enjoyed by rewriting is telling.[132]  Even if everything Plaintiffs say about those points is true—and it is not—that does not mean Plaintiffs can show, much less quantify, class-wide damages.  Evidence that FSPA premiums are lower than FA2 premiums ***on average*** (or for any given number or percentage of the putative class members) does ***not*** prove damages as to any particular class member.  *See Bell Atlantic*, 339 F.3d at 304–07 (rejecting the use of averages in calculating class damages because they do not "represent[] an adequate approximation of any single class member's damages, let alone a just and reasonable estimate of the damages of every class

---

[131] *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252–53 (D.C. Cir. 2013) (finding that "[c]ommon questions of fact cannot predominate" where the class damages model is "defective" and "where there exists no reliable means of proving classwide injury in fact"); *Hughes v. Ester C. Co.*, 320 F.R.D. 337, 339 (E.D.N.Y. 2017) (certification denied where the plaintiffs "failed to establish a damages methodology that would reliably measure damages on a class-wide basis in a manner consistent with Plaintiffs' theory of liability"); *Bright v. Asset Acceptance, LLC*, 292 F.R.D. 190, 202 (D.N.J. 2013) ("The Supreme Court's recent opinion in [*Comcast*] is clear that a plaintiff seeking class certification must present evidence of a reliable methodology for calculating damages on a class-wide basis.").

[132] *See* Mot. at 6.

member").[133]   Indeed, a Dallas federal court denied class certification where an expert team, which included one of the same experts Plaintiffs propose using here (David N. Fuller), attempted to use statistical averages in their damages model.  *See Turnbow v. Life Partners, Inc.*, No. 3:11-CV-1030-M, 2013 WL 3479884, at *6 (N.D. Tex. July 9, 2013) (explaining that using averages would impermissibly under-compensate some class members and over-compensate others).  Rather, individual class members can maintain a claim under Section 544.052 only if they personally would have been economically better off but for the alleged discrimination.

Determining the premium any given FA2 policyholder would have paid for an FSPA policy requires complex, individualized analysis and evidence.  Plaintiffs claim they can calculate the difference between FA2 and FSPA premiums for each FA2 policyholder for every policy period by using rate calculation tools created by Farmers and known as Auto Off Balance ("AOB") tools.  However, because FA2 policyholders have never purchased an FSPA policy, they have never provided the information to their Agents that is needed to calculate an FSPA premium (discussed below).  Accordingly, neither Plaintiffs nor Farmers can calculate FSPA premiums for FA2 policyholders with any degree of accuracy.

Plaintiffs claim Farmers "developed and has repeatedly used" the AOB tool "for the very purpose of comparing premiums under FA2 and FSPA."[134]  That is not true.  Farmers used the AOB tool only to compare the aggregate rate level difference between the two rating plans based

---

[133] *See also, e.g.*, *Allison v. Citgo Petroleum Corp*., 151 F.3d 402, 419 (5th Cir. 1998) (Rule 23(b)(3) certification properly denied where "plaintiffs' claims for compensatory and punitive damages . . . focus almost entirely on facts and issues specific to individuals rather than the class as a whole"); *Pioneer Valley Casket Co., Inc. v. Serv. Corp. Int'l*,  CV H-05-3399, 2008 WL 11395528, at *13 (S.D. Tex. Nov. 24, 2008), *report and recommendation adopted*, CV H-05-3399, 2009 WL 10695539 (S.D. Tex. Mar. 26, 2009) (to establish predominance plaintiffs must show that "damages for each class member can be calculated using a common formula that results in 'a just and reasonable estimate of the damages of every class member'") (quoting *Bell Atlantic*, 339 F.3d at 304).

[134] Mot. at 33 (citing no evidence).

on a sample of 100,000 FA2 policyholders. This is a theoretical analysis performed by actuaries using assumptions that only apply in a hypothetical world.[135] That is why Farmers' actuary Helen Tai has testified that she would not expect FSPA premium calculations generated by an AOB tool to be accurate on an individual basis.[136]

The reason an AOB tool cannot be used for Plaintiffs' damages model is evidenced by applying it to the FA2 policyholders who actually purchased an FSPA policy. Farmers randomly sampled 100,000 FA2 policyholders on the date FSPA launched. In the random sample were 3,705 policyholders who actually rewrote during the first half of 2016 (i.e., before the first FSPA rate change).[137] Applying the AOB tool to these policyholders shows how the actual FSPA premiums they were charged after being re-underwritten diverged wildly from what was calculated by the AOB tool.[138] In fact, the FSPA premium the AOB tool projected only matched the premium actually charged for 14 policyholders—less than one-half of one percent.[139]

The AOB tool is wrong at the individual level **over 99.5% of the time** because trying to use it to calculate FSPA premiums for FA2 policyholders requires numerous assumptions. The only way to use the AOB tool to accurately calculate FSPA premiums for FA2 policyholders

---

[135] Ex. 29, Tai Decl. ¶¶ 14–21.

[136] *See* Ex. 20 (Tai Dep. 72:1–19); *see also id.* (Tai Dep. 136: 9–18) (stating the tools are for "high-level estimates" only and clarifying the tools entail calculations at the individual vehicle level, "however, we don't expect that [those] calculation[s] would be accurate on an individual basis); *id.* (Tai Dep. 211:11–15) (discussing rewrite AOB tools specifically and emphasizing they are not meant to be used to quantify the impacts of the changes on an individual policyholder basis).

[137] Ex. 29, Tai Decl. ¶ 34.

[138] *Id.* (providing examples of large differences); Ex. 27, Braithwaite Report ¶¶ 72–75.

[139] Ex. 27, Braithwaite Report ¶¶ 72–75.

would be to collect individualized information from every class member through individual discovery.[140] Individualized discovery is needed to obtain, for example:

- Credit history at the time of the rewrite[141]
- Motor vehicle records ("MVR") at the time of the rewrite[142]
- Whether the policyholder would have purchased the optional accident forgiveness coverage[143]
- What policy limits or deductibles the policyholder would have selected where their FA2 limits or deductibles are not available in FSPA[144]
- Whether the policyholder qualifies for new discounts in FSPA[145]

The importance of these missing data points is reflected by the significant impact credit reports and MVRs can have on a premium calculation under the FSPA rating plan, which uses this information to determine multiple rating factors.[146] To demonstrate the point, Farmers took the FA2 data available to it for the three Plaintiffs *before* any of them rewrote and calculated premiums using the AOB tool. It calculated premiums for each Plaintiff using four different credit scenarios: (1) each Plaintiff's credit data when his or her FA2 policy was initially purchased; (2) the best credit possible; (3) worst credit possible; and (4) for Plaintiffs who rewrote, their credit data when they purchased their FSPA policies. The results are reflected in the following chart:

---

[140] Ex. 29, Tai Decl. ¶¶ 28–30, 33.

[141] Ex. 29, Tai Decl. Ex. D at 5–6.

[142] *Id.* at 7–9.

[143] *Id.* at 11.

[144] *Id.* at 6–7; *see also* Ex. 31, Lee Decl. ¶¶ 29–31 (detailing differences).

[145] Ex. 29, Tai Decl. Ex. D at 9.

[146] Ex. 29, Tai Decl. ¶ 38 and Ex. D; Ex. 27, Braithwaite Report ¶¶ 65–80.

| | FSPA Rewrite AOB Total Premium | | | |
|---|---|---|---|---|
| FGI Policyholder | Prior Credit History | Best Credit | Worst Credit | Updated Credit at Date of Rewrite |
| **Charles Grigson HH#2302531345** | | | | |
| Policy# 44487826 | $1,621 | $1,057 | $4,053 | $1,306 |
| Policy# 45013031 | 1,816 | 1,200 | 4,502 | 1,480 |
| Charles Grigson Total | 3,437 | 2,257 | 8,555 | 2,786 |
| **Lisa Hoing HH#2392554760** | | | | |
| Policy# 45727304 | 853 | 621 | 1,657 | N/A |
| **David Kelly HH#743557501** | | | | |
| Policy# 44320316 | 607 | 326 | 835 | 328 |

As Grigson's calculations reflect, his FSPA premium increases from $2,257 to $8,555 (nearly 400%) as his credit score goes from best to worst. And based on his FA2 credit data, the AOB tool estimated his FSPA premium would be $3,437. Yet his actual credit, obtained at rewrite, results in a premium of $2,786. Credit is but one of the many "assumptions" Plaintiffs would need to make to try to calculate FSPA rates for FA2 policyholders.[147]

Farmers did the same analysis to demonstrate the importance of accurate MVR information in calculating FSPA rates under the FSPA rating plan. The results were equally revealing, with each of the class Plaintiffs' premiums changing by hundreds of dollars depending on their driving records.[148] For example, Grigson's premium increased by over $1,000 due solely to changing his driving record assumptions.[149] The only way to accurately calculate FSPA premiums for each putative class member who never rewrote is to conduct individual discovery to obtain the same information an Agent would need in order to actually rewrite the person.

---

[147] Mot. at 34. Plaintiffs argue that Farmers "represented" the assumptions used in the existing AOB tools are reasonable and that it is "not aware of any different assumptions that would have been better to use." Mot. at 34–35. This is both misleading and irrelevant. As explained above, the tools were used to perform a rate level differential analysis based on a hypothetical world, making the accuracy of any individual premium calculation irrelevant. *See* Ex. 20 (Tai Dep. 68:3–71:19).

[148] *See* Ex. 29, Tai Decl. ¶ 38.

[149] *See id.*

Plaintiffs try to sweep all of these damages issues aside, emphasizing that their proposed model "need not be perfect" and "the need for some approximation" does not render it insufficient.[150] They also insist the need for individualized damages calculations does not defeat predominance. But the issue here is not merely the need to *calculate* damages on an individual basis. It is all of the individualized discovery and proof that would be required to do those calculations. As even the cases upon which Plaintiffs purport to rely make clear, this is why class treatment is not appropriate where damages are not susceptible to accurate calculation using a uniform model or formula, or where adjudicating damages would cause a case to devolve into mini-trials. *See, e.g.*, *Comcast*, 569 U.S. at 35; *Bell Atlantic*, 339 F.3d at 307.[151] That is precisely the case here, which provides further grounds for denying class certification.

**C.** **The Putative Class Cannot be Certified Because Plaintiffs Have Not Met Their Burden to Satisfy the Rule 23(b)(3) Superiority Requirement**

Superiority tests whether a class action provides the most fair and efficient means of resolving the legal issues presented by a controversy. *See* Fed. R. Civ. P. 23(b)(3). Here, the only two relevant superiority factors—class members' interests in individually controlling separate

---

[150] Mot. at 31–33. Because the lack of data is not the result of a statutory violation to maintain it, the lack of necessary data to calculate premiums cannot be held against Farmers here. *See Tyson Foods*, 136 S. Ct. at 1043–47.

[151] *See, also, e.g.*, *Ibe*, 836 F.3d at 529; *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006); *Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 355 (5th Cir. 2005). Plaintiffs' purported reliance on *Bertulli* illustrates this disconnect. *See* Mot. at 32. In that case, the court found individualized damages issues did not defeat predominance but emphasized that "virtually every single issue prior to damages" was common and that plaintiffs also sought injunctive relief that generally did not require individualized findings, and did not address the extent to which individualized fact-finding would be required to adjudicate damages. *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001). By contrast, ***most*** of the issues before damages are individualized here, Plaintiffs seek no injunctive relief on behalf of the class, and individualized fact-finding would be required to calculate the alleged damages accurately.

actions and the manageability of class litigation—weigh strongly against class certification.[152]

First, as explained above, there are differences between the FA2 and FSPA policies that matter to FA2 policyholders, and some policyholders want to keep their FA2 policies instead of rewriting into FSPA.[153] For this reason, policyholders have a real interest in pursuing their chosen remedy individually, weighing against certification. *See* Fed. R. Civ. P. 23(b)(3)(A).

Second, also as explained above, individualized proof predominates in establishing liability and damages (if any) for each FA2 policyholder. Thus, the case cannot be fairly and efficiently managed as a class action. *See* Fed. R. Civ. P. 23(b)(3)(D); *see also Steering Committee*, 461 F.3d at 604–05 (emphasizing the interrelatedness of the predominance and superiority requirements); *Castano*, 84 F.3d at 745 n.19 ("The greater the number of individual issues, the less likely superiority can be established.").

## D.     The Putative Class Cannot be Certified Because Plaintiffs Have Not Met Their Burden to Satisfy the Typicality and Adequacy Requirements

The "critical inquiry" regarding typicality "is whether the class representative's claims have the same essential characteristics of those of the putative class." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (citation omitted). If the claims of the named plaintiffs and putative class members do not "arise from a similar course of conduct," then typicality is not satisfied. *See id.* Regarding adequacy, conflicts of interest between the named plaintiffs and the putative class can negate adequacy under Rule 23(a)(4). *See Ward v. Hellerstedt*, 753 F. App'x 236, 247 (5th Cir. 2018) (per curiam); *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 316 & n.28 (5th Cir. 2007).

---

[152] The second and third factors listed in Fed. R. Civ. P. 23(b)(3) neither favor nor disfavor class certification. *See* Fed. R. Civ. P. 23(b)(3)(B) & (C). There is no known existing litigation concerning this controversy. And, by statute, unfair discrimination claims can only be brought in one forum. *See* Tex. Ins. Code § 544.054(a).

[153] *See infra*, Section III(B)(2)(b).

Neither typicality nor adequacy is met here because even if Plaintiffs could prove they were denied access to FSPA and suffered economic harm, that would not prove "discrimination" or economic harm as to any other putative class member.[154]  While the coverage differences may not have mattered to Grigson and Kelly when they decided to rewrite, that is certainly not the case for every FA2 policyholder.[155]  And while Plaintiffs may not have had an accident whereby the coverage differences impacted their personal calculation of damages, only individualized proof can determine if any other FA2 policyholder has.  There simply is no "typical" claim here.  *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998), *cert. denied*, 524 U.S. 923 (1998) (where each claim hinged on a class member's particular interactions with defendant, which varied from person to person, "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim," and typicality was not satisfied).

For the same reasons, Plaintiffs are not adequate class representatives, and there are intra-class conflicts.  The decision to rewrite is highly individualized, and the coverage differences between FA2 and FSPA mean more to some people than they do to others.  Grigson and Kelly decided to switch, a decision that other class members have disagreed with and decided against.  And while Hoing has not switched, her ultimate decision will bear no relation to the decision to be made by any other FA2 policyholder.  She has not established that what may ultimately be in her "best interest" (including whether Auto Rewards, rental coverage, and Mexico coverage are important to her) would be in anyone else's "best interest."

---

[154] *See generally* Section III(b)(2), *supra*.  Plaintiffs concede this, and the lack of typicality, in their depositions.  *See* Ex. 25 (Kelly Dep. 63:6–65:23, 89:7–91:6, 99:24–101:22, 103:9–106:19, 136:15–141:9, 145:12–23); Ex. 26 (Grigson Dep. 88:3–90:1, 218:21–219:13, 219:25–220:6, 230:11–231:7); Ex. 24 (Hoing Dep. 55:11–20, 136:20–137:10).

[155] *See, e.g.*, Ex. 35, Ruiz Decl. ¶¶ 4, 5; Ex. 38, Dao Decl. ¶ 8; Ex. 37, Myers Decl. ¶ 7; Ex. 36, Engelbaum Decl. ¶¶ 4, 5, 7.

# IV. <u>CONCLUSION</u>

If a single policyholder accused an insurance company of unfairly discriminating against him by creating barriers so he could not purchase a certain policy, the insurer would want to conduct discovery from the policyholder, the policyholder's agent, and from others who interacted with the policyholder (such as the agent's staff) to find out exactly what happened. It would want to know whether the policy had been offered to the policyholder, whether the policyholder had declined it, and whether the policyholder would have been economically better or worse off if he had purchased the policy in question. All of this evidence would be key to the claim and the company's defenses. Yet here, Plaintiffs ask the Court to deny Farmers of this key proof and instead conduct a class trial that will not establish liability or damages for any class member. For the reasons explained herein, the Court should decline to do so.

Plaintiffs have failed to carry their evidentiary burden of proving this case can and should be tried as a class action and have failed to satisfy the requirements of Rule 23. Farmers respectfully requests that the Court deny Plaintiffs' Motion for Class Certification in its entirety.

Dated:  May 20, 2019

Respectfully submitted,

/s/ Scott Incerto
_____

NORTON ROSE FULBRIGHT US LLP

    M. Scott Incerto
    Texas Bar No. 10388950
    scott.incerto@nortonrosefulbright.com
    Adam Schramek
    Texas bar No. 24033045
    adam.schramek@nortonrosefulbright.com
    James Hughes
    Texas Bar No. 24074453
    james.hughes@nortonrosefulbright.com
    William Patrick Courtney
    Texas Bar No. 24087351
    patrick.courtney@nortonrosefulbright.com

98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone:   (512) 474-5201
Facsimile:    (512) 536-4598

    Peter H. Mason (admitted *pro hac*)
    California Bar No. 10388950
    peter.mason@nortonrosefulbright.com
    Cristina Longoria
    Texas Bar No. 24070165
    cristina.longoria@nortonrosefulbright.com

555 South Flower Street, Forty-First Floor
Los Angeles, California 90071
Telephone:   (213) 892-9200
Facsimile:    (213 892-9494


ATTORNEYS FOR DEFENDANT
FARMERS GROUP, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2019, a true and correct copy of the foregoing document was served on all counsel of record via electronic mail.

*/s/ Scott Incerto*
Scott Incerto